Syllabus.

# ERIE RAILROAD CO. *v.* STEINBERG.

*Carriers — Action for breach of contract or for conversion — Measure of damages — Value at time of conversion or reasonable value to' owner — Schedule of rates binding, when — Section 510, General Code — Duty to require shipper to declare value, etc. — Shipper charged with notice of tariffs, when — Carrier's liability cannot be relieved by schedule, when — Section 8994-1, General Code — Intrastate shipments.*

1. Where goods have been delivered to a common carrier for transportation and the common carrier converts the property to its own use, the shipper may maintain an action for damages for breach of contract of carriage or may sue for conversion.

2. In a suit for conversion, where the facts do not authorize the assessment of exemplary damages, the general rule for the measure of damages is the value of the property at the time of the conversion.

3. This general rule is subject to the exception that where the property converted by the defendant to its use consists of articles for personal use, which have been used by the owner and therefore have little or no market value, the measure of damages is the reasonable value to the owner at the time of conversion.

4. Where a railroad has filed a schedule under the provisions of Sections 505 and 506, General Code, showing all rates, fares and charges for transportation of passengers and property, and any service in connection therewith, such rates, fares and charges named in the schedule become the legal rate for the services rendered, and must be charged by it and paid by the shipper or passenger without deviation therefrom.

5. Where a rate or· charge, based upon the value of the articles transported, is provided in the schedule filed with the public utilities commission of the state, it is the duty of the transporting company to require the shipper to declare the value and to demand, collect and receive from him the rate fixed in its schedule filed with the state commission.

6. Where a copy of such schedule is printed and filed as provided by Sections 505 and 506, General Code, shippers and travelers are charged with notice of the tariffs named in this schedule

and must abide thereby, unless the same be found unreasonable by the public utilities commission of the state.

*l.* A common carrier cannot relieve itself from the liability imposed by Section 8994-1, General Code, by any rule or regulation contained in the schedule filed by it with the state public utilities commission.

(No. 14799 — Decided May 9, 1916.)

ERROR to the Court of Appeals of Mahoning county.

On the 20th day of October, 1913, the plaintiff below, Rose Steinberg, filed her petition in the common pleas court of Mahoning county, Ohio, against The Lake Shore & Michigan Southern Railway Company and the Erie Railroad Company.

In her amended petition, she averred that on the 11th day of September, 1913, she took passage at Toledo, Ohio, on The Lake Shore & Michigan Southern Railway for Youngstown, Ohio, and travelled over said railway to Cleveland, and was there transferred to a train of the Erie Railroad Company for Youngstown; that at Toledo she checked her trunk, containing certain goods described in the exhibit attached to her petition; that upon arriving at Youngstown plaintiff presented her check to the Erie Railroad Company and said defendant, "being in possession of said property, refused and failed to deliver the same, and unlawfully converted and disposed of said property to its own use."

The Lake Shore & Michigan Southern Railway Company filed a separate answer, admitting it is

a common carrier doing business in the state of
Ohio and denying all the other allegations in the
petition.

The Erie Railroad Company also filed its sep-
arate answer to the amended petition, in which it
admitted that it is a common carrier of passengers
and freight and denied all the other allegations
of the petition.

Further answering, this defendant averred that
if any baggage was transported for plaintiff over
its line of railway, the same was done under and
by virtue of contract with the plaintiff, that un-
less a greater value was declared by her, it was not
to be liable in excess of $100 for any loss or de-
struction thereof. The answer also averred that
said agreement was made in accordance with and
under and by virtue of and arose from the local,
interdivision and joint tariff of baggage rules and
regulations, excess baggage rates and transfer
charges in force and effect at the time complained
of in said petition, schedules of which were properly
filed with the interstate commerce commission and
with the public utilities commission of the state of
Ohio; that the defendant was then engaged in
interstate commerce; that the rules and regula-
tions on file with the interstate commerce commis-
sion and with the public utilities commission of
Ohio were applicable to the situation of the plaintiff,
and that by reason thereof this defendant is in no
event indebted to plaintiff in excess of $100 for
the complete loss of any baggage shipped by her.

On the trial of the case it was admitted that the plaintiff had taken passage at Toledo, Ohio, as pleaded in her petition, and that the baggage reached the Erie Railroad Company's depot at Youngstown, Ohio, and some three days later, through error of the company's agents, was forwarded to New York, placed on a steamer and taken to Europe.

Upon the admission of these facts The Lake Shore & Michigan Southern Railway Company moved the court to dismiss the case as against it. That motion was sustained without objection on the part of the plaintiff or the defendant, the Erie Railroad Company.

The Erie Railroad Company introduced in evidence, over the objection of the plaintiff, certified copies of the schedules filed with the interstate commerce commission and proof that the same were properly posted as required by law. At the close of the evidence and before argument, the defendant requested the court to charge the jury that "The court says to you as a matter of law that in no event can the plaintiff recover more than the sum of one hundred dollars for loss of baggage."

This request was refused, and the court thereafter instructed the jury that the action was one for conversion and that it might assume that the property described in the plaintiff's petition was converted by the railroad company to its own use, and further charged as follows:

"By consent of counsel there is only one question to be submitted to this jury and that is for you

to determine what the fair market value, at the time of the conversion, was, of these goods. That is the only question that is submitted to you."

At the request of counsel for plaintiff, the court charged further with reference to value as follows: "I say to you it isn't the fair market value, but it is a question of what the goods were reasonably worth to her at the time of the conversion."

Counsel for the defendant made no objection whatever to the statement of the court to the jury, that by consent of counsel this one issue only was submitted to the jury, nor is it now claimed that this charge was not given by consent of counsel for all parties, the error complained of being the refusal of the court to charge as requested by plaintiff in error. A general exception, however, was taken to the charge as a whole.

The jury returned a verdict against the Erie Railroad Company in favor of the plaintiff for $285. A motion for new trial was overruled and judgment entered on the verdict. Error was prosecuted to the court of appeals, which court affirmed the judgment of the common pleas court.

This proceeding in error is prosecuted in this court to reverse the judgment of the common pleas court and the judgment of the court of appeals affirming the same.

*Messrs. Hine, Kennedy & Manchester,* for plaintiff in error.

*Messrs. Livingstone, Livingstone & George,* for defendant in error.

DONAHUE, J.    The pleadings and the facts distinguish this case from the case of the *Boston & Maine Railroad* v. *Hooker,* 233 U. S., 97.

In that case, Mr. Justice Day, in his opinion, said, at page 109:

"It is to be borne in mind that the action as tried and decided in the state court was not for negligence of the railroad company as a warehouseman for the loss of the baggage after its delivery at Sunapee Lake station, but was solely upon the contract of carriage in interstate commerce."

The amended petition in the case under consideration avers that —

"Upon arriving in Youngstown, plaintiff presented her check to the Erie Railroad Company and demanded her property, and was entitled to possession of the same.    On said date, said defendant being in possession of said property, refused and failed to deliver the same, and unlawfully converted and disposed of said property to its own use."

The Erie Railroad Company in its answer denied these averments of the amended petition, but upon the trial of the case it was admitted that the trunk arrived at the Erie depot in Youngstown, Ohio.

It further appears from the undisputed evidence (plaintiff's Exhibit A) that on September 14 the trunk was sent by the defendant to New York, placed on a steamer and taken to Europe.

Immediately upon the admission being made that the trunk had reached the Erie depot at Youngstown, Ohio, The Lake Shore & Michigan Southern

Railway Company moved the court to be dismissed from the case.   The court sustained this motion without objection on the part of the plaintiff or the Erie Railroad Company.

The Lake Shore & Michigan Southern Railway Company was the initial carrier and the company with whom the contract of carriage was made. Under the provisions of Section 8994-1, General Code, this company was liable upon its contract of carriage for any loss, damage or injury to such property, caused by it or by any common carrier, railroad or transportation company to which it delivered such property, or over whose line or lines the property passed in transportation to its final destination.

The fact that this defendant, upon its own motion and evidently with the consent of the other parties, was dismissed from the suit, is sufficient to show that this action was not tried and decided in the common pleas court "solely upon the contract of carriage," as was the case of the *Boston & Maine Railroad* v. *Hooker, supra.*

On the contrary, the petition averred a conversion of the property to defendant's use after it reached the Erie depot at Youngstown, Ohio.   The recitals in the petition, as to the purchasing of a ticket and checking this baggage at Toledo, Ohio, are pertinent only as showing that the defendant came into the lawful possession of it.   The admissions made upon the trial of the case sustain the averments of the amended petition.

It is true that the plaintiff in error pleaded a contract of carriage, in its answer to the amended

petition.   No reply was filed taking issue therewith.
It offered in evidence the joint tariff of baggage
rules and regulations relating to excess baggage
rates, to the introduction of which the plaintiff
objected, but the court admitted the same over her
objection.   The charge of the court, however, prac-
tically eliminated this evidence from the considera-
tion of the jury, and instructed the jury that the
action was one for conversion and that it might
assume that the property described in the plain-
tiff's petition was converted by the Erie Railroad
Company to its own use.   This charge was evi-
dently given in view of the admissions made in
the case, for in the next paragraph of the charge
the court instructed the jury that by consent of
counsel there was only one question for its con-
sideration, and that was the value of the goods at
the time of the conversion.

Counsel for the railroad company caused to be
noted a general exception to the charge of the
court, but did not object or except to the statement
by the court that by consent of counsel the only
issue for the consideration of the jury was the
value of the property converted to the company's
use, nor is any claim made now that counsel for
the plaintiff in error did not consent that this single
issue of value was the only issue to be submitted
to the jury.   On the contrary, the only error urged
by counsel for plaintiff in error upon the attention
of this court is the refusal of the trial court to
charge, as requested, that "As a matter of law in
no event can the plaintiff recover more than the
sum of one hundred dollars for loss of baggage."

It clearly appears that this was solely and only an action for conversion after the baggage had reached the Erie depot at Youngstown, Ohio, and that the only serious dispute between the parties was not as to the actual conversion, for that was admitted, but rather as to the amount the plaintiff was entitled to recover for such conversion. Even if counsel for plaintiff in error had not consented that the sole question to be submitted to the jury was the amount that plaintiff was entitled to recover by reason of such conversion, nevertheless the charge of the court was right, for there was really no disputed question of fact in this case other than the amount the plaintiff was entitled to recover from the defendant.

Under the pleadings and proof the plaintiff was entitled to recover for a conversion of her property. *B. & O. Rd. Co.* v. *O'Donnell,* 49 Ohio St., 489; *Robinson* v. *Austin,* 2 Gray, 564; *Rosenfeld* v. *Central Vermont Ry. Co.,* 111 App. Div., 371; *Magnin* v. *Dinsmore,* 70 N. Y., 410, and *Baldwin* v. *Cole,* 6 Mod., 212.

In an action for conversion, where the facts will not justify exemplary damages, the measure of damages is ordinarily the value of the goods at the time of conversion. *B. & O. Rd. Co.* v. *O'Donnell, supra.*

Some authorities hold that the measure of damages in such cases ordinarily is the value of the goods at the time of conversion, or any higher value they may have had between the time of conversion and the time of trial. That question, however, is not in this case.

The general rule as to the measure of damages is subject to the exception that where the property is of a strictly personal nature, such as wearing apparel and the like, which would have little or no market value, the measure of damages for conversion of such property is its reasonable value to the owner at the time of conversion, and the court in this case so charged the jury. The request of the plaintiff in error had no application to the issue joined by the pleadings or to the proof in this case, and was therefore properly refused by the trial court.

If it were conceded, however, that this action was based solely upon the contract of carriage, nevertheless the request of the defendant was properly refused by the trial court.

It is contended on the part of the plaintiff in error that the regulations shown in joint tariff of baggage rules and regulations contained in the schedules filed by it with the interstate commerce commission and the public utilities commission of Ohio and printed upon the back of the baggage check given to plaintiff when her baggage was checked, have the force and effect of law, and entered into and became a part of the contract with the defendant in error in this case and limit the amount that she is entitled to recover, if she is entitled to recover any sum or amount whatever.

Undoubtedly it is the law of this state that where a railroad files schedules under the provisions of Sections 505 and 506, General Code, and prints in plain type and keeps on file a copy of such schedules, shippers and travelers are charged

with notice of the tariffs named in these schedules and must abide thereby, unless the same be found unreasonable by the public utilities commission.

Section 506 also requires each railroad to include as part of its schedules "the rules and regulations affecting the rates charged or to be charged," but this does not mean that it may write into such schedules, so filed with the public utilities commission of the state, any rules or regulations that are in direct conflict with the provisions of other statutes of the state. (*Chicago & Alton Rd. Co.* v. *Kirby,* 225 U. S., 155.) Any rules or regulations purporting to exempt the carrier from any part or all of its liability for loss, damage or injury to property delivered to it for transportation, are in direct conflict with the plain, express, positive and unequivocal provisions of Section 8994-1, General Code.

That section provides, among other things, that any common carrier receiving property at a point within the state for transportation to another point within the state, shall be liable for any loss, damage or injury to such property caused by it or by any common carrier, railroad or transportation company to which such property may be delivered or over whose lines such property may pass. If that were all the provisions of this section the contention of the plaintiff in error might be answered in the affirmative, but that section further specifically provides that *"No contract, receipt, rule or regulation shall exempt such common carrier, rail-*

*road, or transportation company from the liability hereby imposed."*

Notwithstanding the clear and unambiguous provisions of this section of the General Code, it is contended on the part of the plaintiff in error that by the rules and regulations contained in the schedule filed by it with the public utilities commission of Ohio, it can exempt itself or limit in amount the liability imposed by this section.

In support of this contention our attention is directed to the case of *Boston & Maine Rd.* v. *Hooker, supra,* construing the Carmack amendment to the Hepburn act of June 29, 1906, regulating interstate commerce.

We recognize the desirability of a uniform construction of the laws of each of the several states of the United States with the construction given by the supreme court of the United States to acts of congress covering the same subject-matter, and particularly is this desirable where these laws relate to the transportation of passengers and freight, but Section 8994-1, General Code, while similar to the Carmack amendment, except in that part which relates to the territorial extent of the application of the law, is not, in the opinion of a majority of this court, susceptible of the construction given the Carmack amendment in the case above cited. Nor is it now necessary to a uniform operation of the laws regulating interstate and intrastate commerce for this court to give to Section 8994-1, General Code, the same construction that was given the Carmack amendment by the supreme court of

the United States in the case of the *Boston &
Maine Rd.* v. *Hooker, supra.*

That case was decided April 6, 1914. The con-
gress of the United States, at its next session after
that decision was announced, passed the Cummins
amendment, amending Section 7 of the Hepburn
act, which amendment provides, among other
things, that the common carrier shall be liable for
the full actual loss, damage, or injury to such prop-
erty, notwithstanding any limitation of liability or
limitation of the amount of recovery or represen-
tation or agreement as to the value in any receipt
or bill of lading, or in any contract, rule, regula-
tion or in any tariff filed with the interstate com-
merce commission, and that any such limitation,
without respect to the manner or form in which it
is sought to be made, shall be unlawful and void,
and, further, that where the goods are hidden by
wrapping, boxing or other means, and the carrier
is not notified as to the character of the goods, the
carrier may require the shipper to state specifically
in writing the value of the goods, and the carrier
shall not be liable beyond the amount so specifically
stated.

It is evident that this immediate action on the
part of congress was occasioned by the construc-
tion given the Carmack amendment by the supreme
court of the United States in the case of the *Boston
& Maine Rd.* v. *Hooker, supra,* but it is in nowise
important whether the action of congress was in-
duced by the belief that it had failed in expressing·
its true intent and purpose in the Carmack amend-

ment, as construed by the supreme court, or that there existed at the time of the adoption of the Cummins amendment a necessity for further legislation on that subject.

The fact remains that congress did pass the Cummins amendment, and the construction given to the Carmack amendment by the supreme court of the United States in the case just referred to is no longer the law applicable to this subject of interstate commerce.

It would also appear that the general assembly of the state of Ohio, when it wrote into Section 8994-1, General Code, the language of the Carmack amendment, had in view the desirability of a uniform operation of the laws relating to interstate and intrastate commerce. Should this court now construe Section 8994-1 in line with the construction given to the Carmack amendment by the supreme court of the United States, it would be necessary for the general assembly of this state, if it desires uniformity of state and interstate commerce laws, to amend that section to conform to the provisions of the Cummins amendment. However, the conclusion this court has reached makes such an amendment unnecessary.

In construing a statute of this state, where no federal question is involved, this court is not required to adopt a construction given to a similar law of the United States by the supreme court of the United States. However, this court would be inclined to follow the judgment of the supreme court of the United States, even though no federal

question was involved, unless it clearly appeared that a different conclusion should be reached.

In construing a statute it is the duty of the court to give effect to the legislative intent. True, the intent of the legislature is to be determined from the language employed, and when that language clearly expresses the intent of the lawmaking body, it should be given its plain, ordinary meaning, for it is not a question what the lawmaking body intended to enact, but rather the meaning of that which it did enact. Where, however, the meaning is doubtful, the history of legislation on the subject may be considered in connection with the object, purpose and language of the law, in order to arrive at its true meaning. *Slingluff et al.* v. *Weaver et al.,* 66 Ohio St., 621.

The passage by congress of the Cummins amendment immediately following the decision in the case of the *Boston & Maine Rd.* v. *Hooker, supra,* would seem to indicate the meaning and intent of congress when it passed the Carmack amendment, and this Cummins amendment was made necessary by the fact that the language employed in the Carmack amendment, as construed by the court, did not clearly express the intent of the lawmaking body.

This later legislation by congress in this regard is an important aid to this court in arriving at the intention of the legislature of this state when it enacted into law Section 8994-1, General Code, for the intent of the general assembly of Ohio when it passed that section must have been identical with the intent of congress when it passed the Carmack

amendment, otherwise the same language would not have been employed.

Aside from these considerations, however, we are compelled to a different construction of Section 8994-1 than the construction given to the Carmack amendment by the supreme court of the United States in the case above cited.

Mr. Justice Pitney, in his dissenting opinion in that case, calls attention to the fact that there is no previous instance where any court in this country has ever held the recovery to be limited to an arbitrary sum, unrelated to the value of the goods lost, without any previous valuation or agreement assented to by the shipper or passenger and without any representation of value made by him, and further calls attention to the clear expression of the legislative purpose in the Carmack amendment to enforce the carrier's responsibility for losses of property caused by it, without regard to any rule or regulation exempting it.

Where a classification or rate is based upon the value of the article to be transported, such rate automatically attaches to the declared or agreed value and becomes the lawful rate, which the carrier must exact and the rate which the shipper must pay. *Chicago & Alton Rd. Co.* v. *Kirby,* 225 U. S., 155.

The duty imposed upon the carrier by Section 510, General Code, to charge, demand, collect and receive the compensation for service rendered, as specified in the schedule, is not a passive, but an active one. It is not met and discharged by leaving

it to the pleasure of the shipper to declare or refuse to declare the value of the goods offered for transportation.

It is not only the right of the carrier to be advised of the full extent of its responsibility, but in order for it to comply with the provisions of Section 510, General Code, it may rightfully require, as a condition precedent to any contract for the transportation of baggage, information from the passenger as to its value. *New York Central & Hudson River Rd. Co.* v. *Fraloff,* 100 U. S., 24, and *Hart* v. *Pennsylvania Rd. Co.,* 112 U. S., 331.

In view of the positive provisions of Section 510, an express contract, written or verbal, between the shipper and the transportation company to carry property known by both parties to the contract to be worth $1,000 for the same rate charged for property worth $100, upon condition that the shipper will release the transportation company from any loss, damages or injury to such property in excess of $100, would not only be in violation of this statute, but against public policy and void, even if Section 8994-1, General Code, did not provide in express terms that a common carrier cannot exempt itself by contract from the liability imposed by that statute. Certainly if an express contract could not be made exempting the carrier from liability for loss or damages to the property transported, or relieve the shipper from paying the legal rate published in the schedules, no implied contract, based upon the theory of con-

structive or actual notice of rules and regulations contained in the schedules filed, can have that effect. There is a substantial difference, however, between a contract purporting to limit or exempt a common carrier from liability under this statute and a contract or agreement fixing the value of the goods delivered for transportation, where the rates to be charged for the transportation service are fixed in the schedules with reference to the value of the property to be transported.

The authorities would seem to be uniform that where a shipper declares a less value than the true value of the property delivered for transportation, in order to obtain a lower rate, recovery for loss or damages will be limited to the amount of the valuation named. *B. & O. Rd. Co.* v. *Hubbard,* 72 Ohio St., 302; *Pennsylvania Co.* v. *Shearer,* 75 Ohio St., 249; *Hoeger* v. *The Chicago, Milwaukee & St. Paul Ry. Co.,* 63 Wis., 100; *Kansas City So. Ry. Co.* v. *Carl,* 227 U. S., 639, 651, and *Bernard* v. *Adams Express Co.,* 205 Mass., 254, 260.

The Cummins amendment, however, expressly prohibits such contract in relation to interstate commerce, where the articles offered for transportation are not hidden from view. Whether the provisions in Section 8994-1, General Code, that "No contract, receipt, rule or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed," should be construed as including contracts relating to value, or only as to contracts relating to liability or nonliability, is a question that does not arise in

this case, for it is not contended that the passenger actually declared the value of the baggage delivered for transportation, but rather that the rules and regulations limiting the carrier's liability to $100, filed with and as a part of the schedule with the public utilities commission, entered into and became a part of the contract of carriage. *Kansas City So. Ry. Co.* v. *Carl, supra,* and *Bernard* v. *Adams Express Co., supra.*

The statutes of our state relating to intrastate commerce are for the purpose of providing and maintaining a uniform rate to all travelers and shippers. These statutes not only provide means and methods for establishing and maintaining uniform rates, but they also provide means and methods for the protection of carriers from imposition and fraud and enable them to fix rates proportionate to the responsibility of the service they assume to perform. Neither shippers nor transportation companies can be permitted to defeat the intention and purpose of these statutes by any loose arrangement that will permit a shipper by his own neglect or refusal to declare value to secure a lesser rate for the transportation of his goods than the legal rate named in the schedules filed with the commerce commission of the state, or that will permit a common carrier by its neglect of duty to charge, demand, collect and receive this legal rate, and to that end require a valuation to be fixed by the shipper when the goods are offered for transportation, to exempt itself from all or any part of the liability imposed by the statute. If rules and

regulations in direct conflict with a statute are permitted to avoid its positive terms and provisions, then the statute might just as well never have been written; if, on the other hand, a shipper is required to fix the value of his property offered for transportation, then he can be required to pay the same rate charged to all other shippers, and the transportation company will receive the full legal rate for the service it performs and the responsibility it assumes.

It was held by the supreme court of the United States in the case of *Louisville & Nashville Rd. Co.* v. *Maxwell,* 237 U. S., 94, that the duly filed tariff of the carrier must be charged by it and paid by the shipper or passenger without deviation therefrom; that shippers and travelers are charged by the duly filed tariff and must abide thereby, unless it is found to be unreasonable by the interstate commerce commission; that neither misquotation of rates nor ignorance is an excuse for charging or paying less or more than the filed rate, and that, notwithstanding a contract for a less rate than the rate named in the tariff filed had been entered into in good faith between the passenger and the carrier's agent, the carrier could recover from the passenger the difference between the legal rate published in the tariff and the rate actually paid by the passenger under the contract for transportation.

This case was decided almost a year later than the case of the *Boston & Maine Rd.* v. *Hooker,*

*supra.*   Under this authority the carrier, had it transported and delivered this baggage to the plaintiff, would be entitled to recover from her the legal rate named in the schedule for baggage of that value, regardless of whether the plaintiff had declared or failed to declare a value when offered for transportation, and regardless of the rules and regulations contained in the schedule filed with the interstate commerce commission, for it would not be contended that these rules and regulations would be more binding upon either party to the transaction than a positive and express contract in relation to the rate to be charged for the service rendered.

It follows, therefore, that if the carrier could recover from the passenger the difference between the rate charged and the legal rate, the passenger should also have the right to claim the protection of the laws· regulating the commerce of the state and enacted for the equal protection of both.

*Judgment affirmed.*

NICHOLS, C. J., JOHNSON, WANAMAKER, NEW-MAN and MATTHIAS, JJ., concur.

JONES, J., dissenting.   The decision is supported neither by authority nor by principles of public policy.   It is not supported by authority: the statute involved is of federal origin, is a copy of the federal act and has been construed by a federal court

— the supreme court of the United States — which has diametrically held the converse of the legal principle outlined in the majority opinion; and the majority opinion, in attempting to distinguish this case by the citation of federal authority in its support, has simply been hoisted upon its own petard. It is not supported by principles of public policy for the reason, often judicially stated and maintained, that the purpose of the public utility laws here involved, state and federal, was to provide "unity of transportation and liability," and to avoid the annoyance and confusion resulting from the application of various rules of liability in the several states, especially in the transportation of freight and baggage from one state to another. This purpose is nullified by the majority opinion.

As a premise to a correct conclusion it must be understood that the laws of this state regulating railroads, including the requirement of filing and publishing the schedules of tariffs, rates, charges, etc., are substantially similar to and almost exact copies of the federal statutes upon the same subject. These requirements are found in the following sections of our General Code: Sections 505, 506, 507, 510 and 8994-1. Furthermore, Section 511, General Code, provides that the schedules prescribed by the public service commission (now public utilities commission) of Ohio, "as far as practicable, shall conform to the forms prescribed by the interstate commerce commission."

And the fact may now be emphasized that, conformably to the provisions of that section, *Section*

*8994-1, General Code, is an exact copy of the Carmack amendment* to the Hepburn act, with the single exception that its provisions are made to apply only to intrastate transportation. The Carmack amendment is found in Section 20 of the act regulating commerce, as amended by Section 7 of the act of June 29, 1906, 34 Stats. at Large, 584, 595.

The legal question involved is whether joint rates, tariffs and charges for services of this character, performed by the carrier, together with the rules and regulations affecting them, when posted and filed in accordance with the Ohio statutes, become a part of the contract of transportation, between passenger and carrier, limiting baggage liability, although no notice of such scheduled rates or of their filing and publication has been brought home to the passenger.

If the contract of carriage in question related to an interstate shipment of baggage, or if the trunk had been shipped across the state boundary, then it must be conceded that every question arising in this case was fully presented and decided in the case of *Boston & Maine Rd.* v. *Hooker,* 233 U. S., 97.

The action at bar was to recover for loss of baggage checked from Toledo, Ohio, to Youngstown, Ohio. The baggage was checked upon a first-class ticket and routed by the L. S. & M. S. and Erie railways to destination. Judgment was recovered in the sum of $285. During the course of the trial the initial carrier was dismissed from the case.

The Erie Railroad Company, in addition to denials, pleaded certain facts in support of its claim that in no event could there be a recovery for a greater sum than $100. It alleged that its contract of carriage was to the effect that unless a greater sum was declared by the passenger and charges paid for increased valuation at the time of the delivery to the carrier, the value of the baggage belonging to or checked for an adult passenger should be deemed and agreed not to be in excess of $100; that if the passenger, at the time of checking the baggage, declared a greater value than $100, each $100 in value or fraction thereof above such allowance would be charged for at 10 per cent. of the excess baggage rates for the distance carried; that said agreement was made in accordance with and under and by virtue of and arose from the local, interdivision and joint tariff of baggage rules and regulations, excess baggage rates and transfer charges in force and effect at the various times complained of in said petition, properly filed with the interstate commerce commission and also duly filed with the public utilities commission of the state of Ohio; that the passenger plaintiff did not declare the baggage to be of any greater value than $100 or pay any excess charges therefor.

The evidence disclosed that the defendant company had published and filed with the public utilities commission of Ohio and also with the interstate commerce commission, in accordance with the Ohio and federal statutes, its schedules relating to rates, fares, charges, rules and regulations for

transporting both passengers and baggage between the points named; that the plaintiff had no actual notice of the regulations limiting liability and that no declaration as to value was made by the plaintiff at the time she purchased her ticket and checked her baggage, and that no inquiry as to value was made by the baggageman. On the face of the baggage check was the following stipulation:

"See conditions on back. Value not stated."

On the reverse side of the baggage check was the following notation:

"NOTICE TO PASSENGERS.

"Baggage consists of passenger's personal wearing apparel, and liability is limited to $100 (except a greater or less amount is provided in tariffs) on full fare ticket, unless a greater value is declared by owner at the time of checking and payment is made therefor."

During the course of the trial, and before argument, at the instance of defendant, the following request was asked to be given to the jury and refused by the court:

"The court says to you as a matter of law that in no event can plaintiff recover more than the sum of one hundred dollars for loss of baggage."

Judgment was rendered for the market value of the goods and the majority of the court of appeals sustained the judgment recovered.

In the case of *Boston & Maine Rd.* v. *Hooker, supra,* the pertinent propositions of the syllabus that apply here are as follows:

"Knowledge of the shipper that the rate is based on value is to be presumed from the terms of the bill of lading and of the published schedules filed with the Interstate Commerce Commission, and the effect of so filing the schedules makes the published rates binding upon shipper and carrier alike.

"The limitation of liability of carriers for passengers' baggage is covered by the Interstate Commerce Act and the Carmack amendment to the Hepburn Act applies thereto as well as to liability for shipments of freight.   *   *   *

"A provision in a tariff schedule that the passenger must declare the value of his baggage and pay stated excess charges for excess liability over the stated value to be carried free, is a regulation within the meaning of §§ 6 and 22 of the Interstate Commerce Act and as such is sufficient to give the shipper notice of the limitation."

Many of the decisions cited in the foregoing majority opinion are not germane to this case, since such decisions are based upon the reciprocal liability of passengers and carrier before the adoption of various commerce laws regulating the shipment of freight and baggage, and prior to the decisions of the courts as to the effect of the adoption of such statutes.

If the Ohio statutes conferring powers upon its public utilities commission in fixing the tariffs, rates and charges, and requiring their publication and filing, are similar to the cognate federal

statutes relating to that subject adopted by congress, and if the state court adopts the same rule of liability as the federal court, then of necessity this case must be reversed. It would not be profitable in this opinion to cite the various acts of congress under which the supreme court of the United States in the case of *Boston & Maine Rd.* v. *Hooker, supra,* determined the duties and liabilities of shipper and carrier. Those sections of the federal law are referred to and set forth in the opinion in that case. That case discusses as well the effect of preceding federal decisions relating to the legal effect of such statutes. Following a discriminating review of those decisions Mr. Justice Day, on page 113, concludes:

"It follows therefore, from the previous decisions in this court, that if it be found that the limitation of liability for baggage is required to be filed in the carrier's tariffs, the plaintiff was bound by such limitation. Having the notice which follows from the filed and published regulations, as required by the statute and the order of the Interstate Commerce Commission, she might have declared the value of her luggage, paid the excess tariff rate and thus secured the liability of the carrier to the full amount of the value of her baggage, or she might, for the purpose of transportation, have valued it at $100 and received free transportation and liability to that extent only, or, as she did, she might have made no valuation of her baggage, in which event the rate and the corresponding liability would automatically attach."

The principles announced in the case of *Boston & Maine Rd.* v. *Hooker, supra,* were supported and emphasized by Mr. Justice Lurton in the three cases: *Adams Express Co.* v. *Croninger,* 226 U. S., 491, 506; *Kansas City So. Ry. Co.* v. *Carl,* 227 U. S., 639, 648, 654, and *Mo., K. & T. Ry. Co.* v. *Harriman,* 227 U. S., 657, 668; by Mr. Justice Lamar in *Chicago, R. I. & P. Ry. Co.* v. *Cramer,* 232 U. S., 490; and were later approved by the United States supreme court in *Geo. N. Pierce Co.* v. *Wells, Fargo & Co.,* 236 U. S., 278, and in *Louisville & Nashville Rd. Co.* v. *Maxwell,* 237 U. S., 94. In the latter case the court permitted the carrier to recover from the shipper an amount exacted which was less than the published rates for interstate transportation under the provisions of the federal law governing filed and published rates under the interstate commerce acts.

In construing the Ohio law upon the same subject, I am constrained to follow the rules of construction adopted by the supreme court of the United States, not only because of the high character of that court and the convincing application of the rule found in its opinions, but also because of the uniformity required in the application of legal principles to liabilities arising under similar statutes under local and federal laws. The adoption of the provisions of the federal law on this subject by the Ohio legislature is evidence that the state desired such uniformity, entailing similar duties and liabilities, and especially is this true where our state commerce act provides that these schedules, "as far as practicable, shall conform to

the forms prescribed by the interstate commerce commission." I am unable to see what principle of substantial justice, equality before the laws, or of public policy should require this court to prescribe a rule of liability to the effect that a shipment of intrastate goods should entitle the shipper to a higher amount of damages than a shipment made over the state boundary. In this state, as elsewhere, a large volume of the transportation business transacted, covering freight and baggage, goes beyond the state border, and the adoption of a different rule of liability by local courts must necessarily result in annoyance and confusion. Thus, a passenger desiring to transport at the same time one piece of baggage within the limits of the state and another without, would be confronted with different duties and with different liabilities, if the rule adopted by the majority opinion in this case should be followed. Questions are now arising, and will continue to arise, presenting different rules of transportation liability under state and federal laws concededly similar, and their application would vary according to the character of the transportation, whether intrastate or interstate. However, upon all interstate shipments the Carmack amendment to the Hepburn act embraces the federal policy and supersedes the state legislation or policy upon that subject, and the construction given such federal laws by the highest court of the land is binding upon state courts. *Adams Express Co.* v. *Croninger, supra; Mo., K. & T. Ry. Co.* v. *Harriman, supra,* and *Chicago, R. I. & P. Ry. Co.* v. *Cramer, supra.*

An effort is made in the majority opinion in this case to distinguish it from the case of *Boston & Maine Rd.* v. *Hooker,* 233 U. S., 97, above referred to. This effort is predicated upon the theory that a *conversion* was involved in this case, and that the liability is like that of *warehouseman;* and it is intimated that if such a liability had been before the supreme court of the United States the *Hooker case* would have been decided otherwise. And in the majority opinion a quotation has been embodied from the opinion of Mr. Justice Day in the case of *Boston & Maine Rd.* v. *Hooker, supra,* as follows:

"It is to be borne in mind that the action as tried and decided in the state court was not for negligence of the railroad company as a warehouseman for the loss of the baggage after its delivery at Sunapee Lake station, but was solely upon the contract of carriage in interstate commerce."

It is therefore intimated that the limitation of liability should not be applied to cases involving *conversion,* and that this principle is inferentially upheld by the statement above quoted, to the effect that a different rule of liability might possibly apply in cases where the duty of warehouseman arose on the part of the carrier.

While these opinions were undergoing preparation the supreme court of the United States, in a very recent decision, held that the provisions of the Hepburn and Carmack amendments, and the liability imposed thereby, apply to a railroad company whether acting as carrier or warehouseman. This principle was decided in the case of *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Dettle-*

*bach,* which is to be reported in 239 U. S., 588. Evidently in that case, which was one of interstate shipment, the same view was taken by this court as is now taken in the majority opinion. That case was taken to the supreme court of the United States, from the court of appeals of the 8th district of Ohio, as "the Supreme Court of the State declined to review the judgment." (Page 591, *supra.*) While the reasons for so refusing are not given, evidently, as the case was one of great general interest, the refusal to review must have been based upon the same conception of the law which the court now holds.

The court of appeals had affirmed the judgment for the full market value of the goods and refused to apply the principle of limitation of liability found in the Carmack amendment to a case involving the duties of a carrier as warehouseman. On page 591, Mr. Justice Pitney, who delivered the dissenting opinion in the case of *Boston & Maine Rd.* v. *Hooker, supra,* states the principle thus: "The question is, whether the limitation of liability may be deemed to have spent its force upon the completion of the carrier's services as such, or must be held to control, also, during the ensuing relation as warehouseman."

In referring to the decision of the court of appeals, the justice says: "The court [Ohio court] considered that the declaration of value stamped upon the bill of lading, and signed by plaintiff's agent, carried no suggestion that it should inure to the advantage of a warehouseman after becoming inert for the relief of the carrier, and that the

custody and protection of the goods as warehouse-man is a distinct service from that of their transportation."

The learned justice thereupon denies the rule attempted to be invoked by the court of appeals and applies the rule of liability limitation, not only to the service of the transportation company as a carrier but to its services as a warehouseman as well.

I might add in this connection that the gravamen of this case was not a violation of duty of the carrier as warehouseman, and that such duty was neither plead, proven nor given in the charge to the jury. The charge of the trial court was very plain and simply confined the jury to one issue, viz., the market value of the baggage.

No one questions but the case made was one for conversion by the misdelivery of the baggage shipped. But again an attempt has been made to distinguish it from the *Hooker case, supra,* upon the theory that a different rule of liability would ensue in case of such misdelivery. This theory, likewise, has been annihilated by the supreme court of the United States in the case mentioned.

It is conceded that the baggage in question was transported over the initial carrier, the Lake Shore & Michigan Southern railroad, from Toledo to Cleveland, Ohio. At that point it was transferred to the connecting carrier, the Erie railroad, for transportation to Youngstown. When the baggage reached Youngstown it was, through mistake or error, misdelivered to a carrier, taken to New York and thence to Europe.

It appears from the record that upon motion the initial carrier was dismissed from the case by the trial court, and the case proceeded against the connecting carrier whose default caused the loss of the baggage. Why the court dismissed the initial carrier from the case is not disclosed, but the action of the trial court in that behalf is clearly erroneous for the reason that under the liability imposed by Section 8994-1, General Code, the plaintiff below had a right of action against The Lake Shore & Michigan Southern Railroad Co., by reason of the default of its connecting carrier. However, the plaintiff had a perfect right to enforce the liability against the Erie railroad, which had actually caused the loss, for the limitation of liability imposed in favor of the initial carrier inures in favor of the connecting carrier, and as to the latter is coextensive with the liability imposed by that section of the code upon the initial carrier. *Kansas City So. Ry. Co.* v. *Carl*, 227 U. S., 639, and *Georgia, Fla. & Ala. Ry. Co.* v. *Blish Milling Co.,* 241 U. S., 190.

It has been held that the Carmack amendment to the Hepburn act, making the initial carrier liable, merely provides a cumulative remedy and does not prevent an action against the succeeding carrier, if the latter be at fault, in case of loss of baggage. *Baltimore, C. & A. Ry. Co.* v. *Wm. Sperber & Co.,* 117 Md., 595.

However, it is insisted in this case that Section 8994-1 does not apply where there has been a *conversion* of the property. This distinction did not occur to either of the members of the court of ap-

peals who decided this case. An inspection of both the majority and minority opinions shows that the judgment was rendered upon the effect and construction of the statute relating to published tariffs and schedules, and the question of conversion did not occur to either of the judges in the court below.

It is true that the trial court held that the case presented was one for conversion, and it may be conceded that such is the case. In cases of this character, where there has been a shipment of goods and a misdelivery by error or mistake to a wrong consignee, the authorities generally hold that this is a conversion. If delivery be made to a wrong person, either innocently or induced by fraud, the carrier is responsible and the wrongful delivery is treated as a conversion. 1 Moore on Carriers (2 ed.), page 233.

In the case of *Oskamp, Nolting & Co.* v. *The Southern Express Co.,* 61 Ohio St., 341, Shauck, J., at page 351, says:

"The cases are numerous in which the carrier's liability has been held to be upon contract, and that delivery to the wrong person is a conversion unless such wrong delivery is induced by the consignor."

Section 8994-1, General Code, imposes a limitation of liability upon the common carrier receiving the goods for shipment and issuing a receipt or bill of lading therefor, and also upon the connecting carrier transporting the same. This section of the code provides that the initial carrier "shall be liable to the lawful holder thereof for *any loss,* damage, or injury to such property caused by it or by any common carrier, railroad or transporta-

tion company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule or regulation shall exempt such common carrier, railroad or transportation company from the liability hereby imposed."

It has already been stated that this section of the General Code is an exact copy of the Carmack amendment, with the sole exception that it makes its provisions applicable to intrastate transportation. The purposes of the section were to provide a rule whereby initial carriers should be liable for the loss, whether caused upon their own or upon any connecting line; to establish the presumptive rule that for transportation throughout the entire route the connecting carriers were acting as agents for initial carriers; to provide for uniformity of rates and liabilities; and, furthermore, to limit liability for loss and damage to the valuations based on the published rates and schedules.

It will be noted that the section of the code provides for a liability "for *any loss,* damage, or injury to such property" caused by the initial and connecting carriers over which the shipment was made. The liability imposed by this section of the code covers *any loss,* whether caused by the negligence of the carrier or otherwise, and the valuations made are conclusive on the parties to the contract of carriage, in the absence of circumstances showing attempts at rebating or false billing. *Atchison, T. & S. F. Ry. Co.* v. *Robinson,* 233 U. S., 180, and *Boston & Maine Rd.* v. *Hooker, supra,* page 112.

The statute in question, having provided a limitation of liability for any loss occasioned by the contract of transportation, covers a loss of baggage occurring through the fault of the carrier in misdelivering the property, where the rates, tariffs and schedules have been lawfully published according to other sections of the General Code. It is true that the property may have been converted by a delivery to a wrong consignee; but it is difficult to see why the limitation of liability does not apply the same as where the property has been damaged or destroyed, as in the following cases: *Mo., K. & T. Ry. Co.* v. *Harriman,* 227 U. S., 657; *Chicago, R. I. & P. Ry. Co.* v. *Cramer,* 232 U. S., 490; *Great Northern Ry. Co.* v. *O'Connor,* 232 U. S., 508; *Boston & Maine Rd.* v. *Hooker, supra,* and *Geo. N. Pierce Co.* v. *Wells, Fargo & Co.,* 236 U. S., 278.

However, this limitation of liability has been held to be covered by the Carmack amendment in cases where there has been a failure to deliver, as in this case. (*Wells, Fargo & Co.* v. *Neiman-Marcus Co.,* 227 U. S., 469, and *Adams Express Co.* v. *Croninger,* 226 U. S., 491.) In both of these cases the limitation of liability was upheld upon the failure to deliver the property shipped. In the latter case Mr. Justice Lurton, on page 511, quoting from a Massachusetts case, uses the following language as applicable to contracts of carriage of this character:

"It is a contract as to what the property is, in reference to its value. The purpose of it is not to change the nature of the undertaking of the common carrier, or limit his obligation in the care

and management of that which is intrusted to him. It is to describe and define the subject matter of the contract, so far as the parties care to define it, for the purpose of showing of what value that is which comes into the carrier's possession, and for which he must account in the performance of his duty as a carrier."

And in the case of *Geo. N. Pierce Co.* v. *Wells, Fargo & Co., supra,* Mr. Justice Day, on pages 283 and 284, uses the following language:

"The case as made therefore presents the question whether one who has deliberately and purposely, without imposition or fraud, accepted a contract of shipment limiting the amount of recovery to $50.00, which is the sum named in the filed tariffs as the amount of recovery in the absence of declaration of a greater value on the part of the shipper, who is given the privilege of paying an increased rate and having the liability for the full value of the goods, is entitled in case of loss to recover the full value of the property.  *  *  *

" 'The valuation declared or agreed upon as evidenced by the contract of shipment upon which the published tariff rate is applied, must be conclusive in an action to recover for loss or damage a greater sum.' "

In the case of *Great Northern Ry. Co.* v. *O'Connor, supra,* Mr. Justice Lamar, on page 516, closes his opinion with a quotation from the case of *Hart* v. *Pennsylvania Rd. Co.,* 112 U. S., 331, as follows:

"The valuation named was the 'agreed valuation,' the one on which the minds of the parties met, how-

ever it came to be fixed, and the rate of freight was based on that valuation, and was fixed on condition that such was the valuation, and that the liability should go to that extent and no further."

In the recent case of *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Dettlebach, supra,* Mr. Justice Pitney, in construing the language found in Section 8994-1, General Code, which was taken bodily from the Carmack amendment, holds that "any loss or damage for which any carrier is liable" includes liability both as carrier and warehouseman, and further that the term "transportation" in the Hepburn act includes *all services in connection with* the receipt and delivery of goods that come within the purview of the commerce act. Section 504, General Code, contains similar provisions covering "any service in connection" with transportation.

This construction of the Carmack amendment was also sustained by the supreme court of the United States in a more recent decision rendered January 24, 1916, *New York, P. & N. Rd. Co.* v. *Peninsula Produce Exchange,* to be reported in 240 U. S., 34. In that case it was contended that the words "any loss, damage, or injury to such property" did not include a loss resulting from unreasonable delay in shipment, and it was urged by counsel that while unity of responsibility was secured if the goods were injured in the course of transportation or *were not delivered,* the statute did not cover damages for unreasonable delay. Mr. Justice Hughes, delivering opinion of the court, at page 38, said:

"We do not think that the language of the amendment has the inadequacy attributed to it. The words 'any loss, damage, or injury to such property' caused by the initial carrier or by any connecting carrier are comprehensive enough *to embrace all damages resulting from any failure to discharge the carrier's duty with respect to any part of the transportation* to the agreed destination."

In the case of *Georgia, Fla. & Ala. Ry. Co.* v. *Blish Milling Co., supra,* the action in the state courts was for *conversion;* but Mr. Justice Hughes, holding that the form of action was immaterial under contracts of shipment under the federal act, said at page 197: "The action is in trover, but as the state court said, 'if we look beyond its technical denomination, the scope and effect of the action is nothing more than that of an action for damages against the delivering carrier.'"

Section 8994-1, General Code, therefore having in terms provided for a limitation of liability for loss, damage or injury to property caused by any common carrier, a misdelivery of the baggage in question, coming within the purview of that section, amounts to a conversion, and under the conceded facts in this case, the liability imposed by the state commerce act is limited to the sum of $100 when the schedule rates, tariffs, fares, charges, rules and regulations for transporting passengers and baggage have been filed and published, and where there is an express provision, as in this case, limiting the liability to that sum. The *Kirby* and *Maxwell cases* cited merely support the

well-known principle that preferential rates, ignorance or misquotation of rates cannot be availed of, as a guise or otherwise, to overcome the policy of congress effected by the adoption of the Carmack amendment as it relates to uniform rates and liabilities. These cases in nowise impinge on the legal principle that in the absence of a declaration of value the "rate and corresponding liability" automatically attach and that, to recover the full value of the baggage, the excess rate should have been paid. *Boston & Maine Rd.* v. *Hooker, supra,* page 113.

The fatal weakness underlying the majority opinion is found in the remarkable *apologia* excusing the holding there made because of the fact that, in the future, the Carmack amendment will not apply for the reason that the same was amended by the Cummins amendment, approved March 4, 1915. It is difficult to conceive how the passage of that amendment affects the present case, for this cause of action arose on September 11, 1913, when the misdelivery of the baggage occurred, and the Cummins amendment was not passed until nearly two years later. It may be conceded that the Cummins amendment vitally changes the rule of liability theretofore prevailing under the Carmack amendment, for the former provides that carriers shall be liable "for full actual loss, damage, or injury to such property" caused by the carrier, notwithstanding any limitation of liability or amount of recovery or representation or agreement as to value, or of any rule or regulation in any tariff filed with the interstate commerce

commission; but the passage of the Cummins amendment was in itself proof of the fact that a different liability was intended by the Carmack amendment and was judicially enforced. The irony of the situation may be gathered from the majority opinion where it states: "We recognize the desirability of the uniform construction of thé laws of each of the several states of the United States, with the construction given by the supreme court of the United States to acts of congress covering the same subject-matter. * * * It would be necessary for the general assembly of this state, if it desires uniformity of the state and interstate commerce laws, to amend that section [8994-1] to conform to the provisions of the Cummins amendment." It is here plainly shown that this court is not now following the construction given by the United States supreme court to a similar public utility statute; but the foregoing quotation imports a hope that the future may bring forth a *locus poenitentiae,* whence may arise a due regard for uniformity of carrier liability under similar federal and state laws and a more ethical respect for the decisions of our highest federal court.

Comment is made in the opinion from which it might be inferred that counsel for the defendant in the trial court made no special objection to the charge of the court that by agreement of counsel the only question left for the jury to determine was the market value of the property. Counsel for the defendant could not do otherwise. After the court had ruled out the sole legal question in the case, to-wit, that the recovery, as a matter of law, should

be limited to the sum of $100 for the loss of baggage, there was nothing left for the jury to determine but the sole question as to what was the actual value of the property. After the defendant had rested his entire case, seeking to limit, under the conceded facts, the damage in the sum of $100, he had done all that was necessary to safeguard his legal rights.