# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## CARROLL COUNTY

CONCRETE CREATIONS &
LANDSCAPE DESIGN LLC et al.,

Plaintiffs-Appellants,

GEORGE WILKINSON et al.,

Defendants-Appellees.

---

### OPINION AND JUDGMENT ENTRY
### Case No. 20 CA 0946

---

Civil Appeal from the
Court of Common Pleas of Carroll County, Ohio
Case No. 2018CVH29069

**BEFORE:**
Carol Ann Robb, Gene Donofrio, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed in part; Reversed in part; Remanded.

---

*Atty. Donald Wiley*, Baker, Dublikar, Beck, Wiley & Mathews, 400 South Main Street, North Canton, Ohio 44720, for Plaintiffs-Appellants and

*Atty. Jason Bing, Atty. Michael Gruber, Atty. Todd Kotler*, Gruber, Thomas & Co., 6370 Mt. Pleasant Street, NW, North Canton, Ohio 44720, for Defendants-Appellees

Dated: July 12, 2021

**Robb, J.**

**{¶1}** Plaintiffs-Appellants Concrete Creations & Landscape Design LLC and Diane Wallace appeal the decision of the Carroll County Common Pleas Court after a bench trial. The court entered judgment against Defendant-Appellee George Wilkinson for breach of contract and conversion. Appellants contend the court erred in failing to find Wilkinson was also liable for defamation, fraud, and intentional interference with business relations. These arguments are overruled.

**{¶2}** Appellants then argue the court awarded inadequate breach of contract damages of $15,000 for wrongful dissociation and $20,000 for violating the non-compete clause. To the contrary, Wilkinson's cross-appeal asserts these contract damages were speculative and excessive. The award for breach of the dissociation clause was within the trial court's discretion in weighing the evidence and is upheld. However, the award for breach of the non-compete clause was speculative and unsupported by sufficient evidence, allowing only a nominal damage award.

**{¶3}** Wilkinson's cross-appeal also alleges the court's finding of liability for conversion was against the manifest weight of the evidence. In the alternative, he urges the proper amount of damages for conversion was the value at the time of conversion rather than the replacement cost. Upholding his argument in part, the conversion damage award is reduced from $13,948.50 to $12,000.

**{¶4}** For the following reasons, the trial court's judgment is affirmed in part and reversed on two items: (1) the conversion damage award is reversed and reduced to $12,000; (2) the breach of contract award for the non-compete clause is reversed, and the case is remanded with instructions to enter a nominal damage award on the non-compete contract claim.

STATEMENT OF THE CASE

**{¶5}** On October 11, 2017, Diane Wallace and George Wilkinson signed an Operating Agreement while forming Concrete Creations & Landscape Design LLC (CCLD). The agreement named Wallace as the manager, Wilkinson as the Chief Executive Officer, and a third member as the Chief Financial Officer.

**{¶6}** Wallace said she was to provide the financial backing to start the company and the other two were to provide customers, labor, and equipment, Wilkinson from his

lawn care business and the third member from his concrete business. (Tr. 11). Yet, they agreed to release the third member soon after formation, and he left with his equipment. (Tr. 12-13). Moreover, Wallace acknowledged there was a verbal agreement that she pay Wilkinson for his labor in the amount of $1,000 per week, which was then decreased to $750 per week. (Tr. 51, 102, 159).

{¶7} After the agreement was signed that fall, Wilkinson performed lawn care for CCLD. In preparation for winter, Wilkinson engaged CCLD in a subcontracting relationship with a business (BG) who had various clients in need of snow plowing. When it started snowing, Wilkinson plowed for CCLD using his personal pickup truck. Wallace purchased plowing equipment for Wilkinson's truck, such as a plow and a bed box for salt. (Tr. 23, 49-50). For assistance plowing, Wilkinson secured the services of a third-party (DD), who Wallace agreed would be their back-up if the former third member and Wilkinson's friend were both unavailable. (Tr. 16, 19).

{¶8} Wallace purchased a building, which she wanted the company to lease from her. Salt and equipment was stored in the building. She put $4,000 into a company bank account for expenses and left for Florida before Christmas. (Tr. 16-17). Wilkinson said Wallace was behind in paying him, and he could not afford to live. During a snowstorm requiring him to plow the same lots multiple times, he ran out of money for expenses, such as fuel for plowing. (Tr. 159).

{¶9} On January 13, 2018, Wilkinson informed Wallace that he quit. CCLD replaced Wilkinson's labor by paying DD to provide additional snow plowing services. CCLD continued to use Wilkinson's truck but later returned it to him upon his demand. Wallace claimed Wilkinson agreed to transfer ownership of his truck to the company, which he denied. Wallace said CCLD lost most of its customers after Wilkinson quit. Later, Wilkinson briefly found employment with Cornerstone Landscaping (Cornerstone).

{¶10} On May 14, 2018, CCLD and Wallace filed suit against Wilkinson alleging: breach of contract (for disassociating from and competing with CCLD); fraud (for misrepresentations when he allegedly agreed to transfer his truck to CCLD, promised he would not compete with CCLD, and said he would only use the company debit card for business expenses but then charged personal expenses); defamation (for written statements on his Facebook page and in texts); conversion (for maintaining possession

of company assets); intentional interference with business relationships (with BG and other unnamed entities); breach of fiduciary duty (reiterating allegations on competing, conversion of property, and defamation); and conspiracy (with Wilkinson's wife as an additional defendant). A permanent injunction was requested (to enjoin competition and turn over passwords and assets). Punitive damages were sought on the fraud and defamation claims.

{¶11} Wilkinson filed an answer with counterclaims. He set forth claims for conversion and breach of contract against both CCLD and Wallace and claims for breach of good faith and fair dealing and breach of fiduciary duty against Wallace. He alleged he was not fully compensated and the company was not fully funded by Wallace in accordance with her representation to do so.

{¶12} The case was tried to the court in a bench trial on August 25, 2020, and the court issued its judgment on September 16, 2020. The court found against Wilkinson on all counts of his counterclaim. The court found the company was funded by Wallace and it could not be concluded she still owed him money, noting the company used his personal account for deposits at first and his testimony did not sufficiently establish that all deposits were used for business expenses.

{¶13} On the complaint filed by Wallace and CCLD, the court found the allegations of fraud against Wilkinson were unsupported and ruled in his favor on the defamation claim, finding his statements were protected opinions. On the claim for intentional interference with business relations, the court found the evidence lacked credibility as to the reason for CCLD's terminated relationships with BG (the business who provided CCLD with some plowing jobs) or other customers and did not show Wilkinson actively interfered in CCLD's relationship with Cornerstone just because he worked there after he left CCLD.

{¶14} However, on the breach of contract claim, the court determined Wilkinson violated the "Non-competition" clause in Section 19.07 of the Operating Agreement due to his employment with Cornerstone, a customer of CCLD. He did not violate the clause as a result of his employment with a subsequent company (G&T), where he began working in the fall of 2018, as there was no evidence G&T was a customer and the non-compete clause only prohibited contacting or providing services for CCLD's customers

and disclosing the customer list.  The court awarded $20,000 in damages for Wilkinson's breach of contract by working for Cornerstone but denied the request to enjoin his solicitation of customers as the clause was only effective for two years.

**{¶15}**  The court also found Wilkinson liable for breaching the contract due to his wrongful dissociation in violation of Section 13.04 of the Operating Agreement.  The court awarded $15,000 in damages for this breach of contract.

**{¶16}**  On the conversion claim against Wilkinson, the court found he returned all items in his possession belonging to the company except a detachable plow.  The court awarded $13,948.50 as damages for conversion, which was the cost Wallace paid for a replacement plow.

**{¶17}**  Wilkinson was additionally ordered to turn over any social media passwords belonging to CCLD.  It was noted the bifurcated punitive damages request for fraud and defamation were moot due to the non-liability findings on those claims.  The court also said a prior voluntary dismissal of the claim against Wilkinson's wife involved a dismissal of the conspiracy count and declared any other outstanding claims were denied.

**{¶18}**  Appellants filed a timely notice of appeal.  They set forth four assignments of error, which challenge the court's decisions on:  (1) defamation, (2) fraud, (3) intentional interference with business relations, and (4) contractual damages.

**{¶19}**  Wilkinson filed a timely cross-appeal.  He sets forth three assignments of error, which challenge the court's decisions on:  (1) liability for conversion, (2) contractual damages, and (3) conversion damages.

**{¶20}**  Before proceeding we note two pages of Wallace's deposition were used at trial in cross-examination for impeachment purposes on her past landscaping experience.  (Tr. 54).  As Wilkinson's brief points out, this did not mean the entire deposition was evidence at the bench trial which could be cited by Appellants in this appeal which considers only the evidence presented and admitted during the bench trial.

DEFAMATION

**{¶21}**  Appellants' first assignment of error alleges:

"THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE APPELLEE – A FORMER BUSINESS PARTNER OF THE APPELLANT – HAD COMMITTED [LIBEL] 'PER SE' IN AN ATTEMPT TO DAMAGE APPELLANTS' REPUTATION IN HER

TRADAND OCCUPATION BY PUBLISHING TEXTS AND SOCIAL MEDIA POSTS ACCUSING THE APPELLANT OF BEING A 'LIAR', A 'CHEAT', 'MENTALLY ILL', 'STUPID', AND 'A SCAMMER'."

**{¶22}** Wallace obtained copies of statements Wilkinson made on his personal Facebook page and in texts he sent to his friend (who showed the texts to Wallace). The court listed the messages it was admitting as exhibits, and there was no objection. (Tr. 198-200). The court found in favor of Wilkinson on the defamation claim after applying the Ohio Supreme Court's *Scott/Vail* totality of the circumstances test for determining whether a statement is a constitutionally protected opinion. On appeal, five specific labels used by Wilkinson are raised by Appellants to support their defamation claim: liar, cheat, scammer, mentally ill, and stupid.

**{¶23}** Appellants suggest they were relieved from proving various elements of defamation because these labels constituted libel "per se" as they were harmful on their face and they injuriously affected character and a trade or profession. *See Becker v. Toulmin*, 165 Ohio St. 549, 138 N.E.2d 391 (1956). *See also Akron-Canton Waste Oil Inc. v. Safety-Kleen Oil Serv. Inc.*, 81 Ohio App.3d 591, 601, 611 N.E.2d 955 (9th Dist.1992) (a written statement accusing the plaintiff of a crime is defamation per se). Appellants cite a case holding: "A statement that someone is a liar, such as that made in the leaflet, clearly is one which would tend to injure that person's reputation, and courts have considered such statements to be defamatory on their face." *See Dale v. Ohio Civ. Serv. Emp. Assn*, 57 Ohio St.3d 112, 117, 567 N.E.2d 253 (1991).[1] Assuming Wilkinson's statements were false, Appellants say the trial court should have given more weight to the fact that the contested words were written by a former business partner which would lead a reader to believe they were credible assertions based on special knowledge.

**{¶24}** Wilkinson counters by pointing out this defamation per se argument is irrelevant if his words were constitutionally protected under the opinion privilege, quoting:

---

[1] The issues before the *Dale* Court were whether the defamation occurred during a labor dispute, which required the plaintiff to show actual malice, and whether there was evidence meeting this standard. There was no discussion of the *Scott* test for protected opinion. *Dale* was decided in 1991, after the United States Supreme Court's *Milkovich* decision and before the Ohio Supreme Court's 1995 *Vail* case reaffirmed the totality of the circumstances test for the opinion privilege previously set forth in *Scott*. *See Vail*, 72 Ohio St.3d at 281 ("Regardless of the outcome in *Milkovich*, the law in this state is that embodied in *Scott*."). *Dale* was also decided before the specific application of *Scott* to a non-media defendant in *Wampler*.

"Once a determination is made that specific speech is 'opinion,' the inquiry is at an end. It is constitutionally protected." *Vail v. The Plain Dealer Publishing Co.*, 72 Ohio St.3d 279, 284, 649 N.E.2d 182 (1995) (Douglas, J., concurring). In other words, defamation per se does not eliminate the constitutional privilege of free speech. Wilkinson urges the contested words were vague, general, and not readily verifiable and observes he was "clearly speaking as his own advocate, in his own opinion, rather than neutral narrator of facts." He emphasizes the failure in Appellants' brief to specifically acknowledge the *Scott/Vail* opinion privilege test applied by the trial court.

**{¶25}** In reply, Appellants point to the portions of their brief reviewing the circumstances which correspond to factors in the *Scott/Vail* totality of the circumstances test, such as: the specific words, the context of a former business relationship, and the resulting inference of his special knowledge of objectively verifiable facts about Wallace.

**{¶26}** Defamation occurs when a publication contains a false statement "made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *American Chem. Soc. v. Leadscope Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, ¶ 77. A plaintiff suing for defamation must generally show: a statement of fact was published; it was false; it was defamatory; the plaintiff suffered injury as a proximate result of the publication; and the defendant acted with the requisite degree of fault in publishing the statement. *Id.*

**{¶27}** A publication is considered to be libel per se if the publication on its face "reflects upon the character of such person by bringing him into ridicule, hatred, or contempt, or affects him injuriously in his trade or profession" by the use of unequivocal words. *Becker*, 165 Ohio St. at 553-558 (as opposed to libel per quod where harmless words become defamatory through innuendo and interpretation). This 1956 *Becker* case cited in Appellants' brief said if a publication was libelous per se, then there was a presumption as to falsity, malice,[2] and damages. *Id.* at 557.

**{¶28}** Initially, it must be recognized the presumptions are rebuttable. *See, e.g., Sayavich v. Creatore*, 7th Dist. Mahoning No. 07-MA 217, 2009-Ohio-5270, ¶ 93-94

---

[2] The term malice referred to fault or state of mind, not actual malice (as required for punitive damages). *See generally Pickle v. Swinehart*, 170 Ohio St. 441, 442-443, 166 N.E.2d 227 (1960).

(presumption of damages in a defamation per se claim is rebuttable); *Wilson v. Wilson*, 2nd Dist. Montgomery No. 21443, 2007-Ohio-178, ¶ 14 (legal presumptions are rebuttable, including the defamation presumption of damages). We also note truth is a complete defense to a claim for defamation (regardless of whether the libel is per se). *See Ed Schory & Sons Inc. v. Society Natl. Bank*, 75 Ohio St.3d 433, 445, 662 N.E.2d 1074 (1996), citing R.C. 2739.02.

**{¶29}** Furthermore, as the *Dale* Court pointed out, former law holding a defendant strictly liable for publishing certain defamatory statements (*unless he could prove privilege or truth*) *has been substantially altered due to First Amendment concerns.* *Dale*, 57 Ohio St.3d at 113-114. The plaintiffs in "all defamation cases" are governed by a clear and convincing standard of proof. *Id.* at 113, citing *Lansdowne*, 32 Ohio St.3d at 180-181 (clear and convincing evidence required on the element of fault, but not on harm). "The plaintiff in a defamation case now has the burden of proving both that the statement was false and the defendant was at least negligent in publishing it." *Id.* at 114, citing *Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St.3d 176, 178-180, 512 N.E.2d 979 (1987) (maintaining a negligence standard for private plaintiffs, instead of extending the public figure actual malice for liability to private plaintiffs, but increasing the standard of proof), citing *Gertz v. Robert Welch Inc.*, 418 U.S. 323, 347, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual").

**{¶30}** The trial court's application of a privilege meant it was not required to reach the matter of fault and various other matters. Most notably: "one of the elements of a private figure's cause of action in defamation is a false statement, and a statement deemed to be an opinion as a matter of law cannot be proven false." (Citations omitted). *Wampler v. Higgins*, 93 Ohio St.3d 111, 752 N.E.2d 962 (2001), fn. 8. As the Supreme Court pointed out in *Wampler*, even the 1956 *Becker* case said words that are defamatory per se carry certain presumptions "unless published on a privileged occasion." *Id.*, quoting *Becker*, 165 Ohio St. at 557. One such privilege is the "opinion privilege" which recognizes opinions are "nonactionable expressions" of a defendant's personal judgment. *Wampler*, 93 Ohio St.3d at 127, 132.

Case No. 20 CA 0946

**{¶31}** "The right to sue for damage to one's reputation pursuant to state law is not absolute. Instead, the right is encumbered by the First Amendment to the United States Constitution." *Soke v. Plain Dealer*, 69 Ohio St.3d 395, 1994-Ohio-337, 632 N.E.2d 1282 (1994). Even more so, the right is encumbered by the free speech rights in the Ohio Constitution: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press." Ohio Constitution, Article 1, Section 11. In granting the opinion privilege to a defendant in a defamation action, the Ohio Supreme Court has interpreted this constitutional provision as providing a *stronger* protection for opinions than the First Amendment to the United States Constitution. *See Wampler*, 93 Ohio St.3d at 116-117, 132; *Vail*, 72 Ohio St.3d at 281.

**{¶32}** In *Scott*, the Ohio Supreme Court adopted a totality of the circumstances test for determining whether an allegedly defamatory statement was the allegation of a factual item or was a non-actionable protected opinion. *Scott v. News-Herald*, 25 Ohio St.3d 243, 250, 496 N.E.2d 699 (1986). The test was reaffirmed in *Vail* as this state's position under the Ohio Constitution in response to interceding First Amendment law. *Vail*, 72 Ohio St.3d 279. The cases initially involved media defendants, but the Court thereafter specified that a defendant who is a private citizen benefits from the same totality of the circumstances test in ascertaining the absolute opinion privilege. *Wampler*, 93 Ohio St.3d at 125 (private individual sued another private individual who expressed *protected opinions* in a writing criticizing the plaintiff's ethics).

**{¶33}** This totality of the circumstances test is "a compass to show general direction and not a map to set rigid boundaries." *Scott*, 25 Ohio St.3d at 250. It is not a "bright-line test." *Vail*, 72 Ohio St.3d at 282. Still, the applicability of the opinion privilege to determine whether an alleged defamatory statement constitutes opinion or fact in a particular Ohio case is a question of law for the court. *Wampler*, 3 Ohio St.3d at 127; *Scott*, 25 Ohio St.3d at 250.

**{¶34}** In applying the totality of the circumstances test to ascertain the status of a statement as a protected opinion, the Court supplied "at least four factors" to review: (1) the specific language used; (2) whether the statement was verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appeared.

*Vail*, 72 Ohio St.3d at 282, upholding *Scott*, 25 Ohio St.3d at 250. The standard is "fluid" with the weight assigned to any one factor dependent on the facts and circumstances presented. *Vail*, 72 Ohio St.3d at 282. We now review the law on each of the factors, and then apply the law to the statements raised in this appeal.

**{¶35}** First, in viewing the specific language used, the court must consider how the words are commonly understood. *Scott*, 25 Ohio St.3d at 251. The court asks "whether a reasonable reader would view the words used to be language that normally conveys information of a factual nature or hype and opinion; whether the language has a readily ascertainable meaning or is ambiguous." *Vail*, 72 Ohio St.3d at 282-283. Allegedly actionable words tend to be understood as mere opinion if they are: loosely definable, variously interpretable, indefinite, imprecise, ambiguous, value-laden, or subjective statements. *Wampler*, 3 Ohio St.3d at 128-129 (such as the description of a landlord as ruthless, uncaring, greedy, self-centered, and mindless), citing *Cole v. Westinghouse Broadcasting Co. Inc.*, 386 Mass. 303, 435 N.E.2d 1021 (1982) (where the defendant called a journalist's reporting "sloppy and irresponsible") and *Buckley v. Littell*, 539 F.2d 882 (2d Cir.1976) ("fellow traveler" of "fascists" was susceptible of widely different interpretations).

**{¶36}** Second, in determining if the statement is verifiable, the court is to consider whether "[u]nlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event." *Scott*, 25 Ohio St.3d at 252. If the "statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content" but will understand the statement is "value-laden and represents a point of view that is obviously subjective." *Vail*, 72 Ohio St.3d at 283.

**{¶37}** Third, in viewing the general context of the words, the court employs "an analysis of the larger objective and subjective context of the statement." *Scott*, 25 Ohio St.3d at 252. Although not dispositive, the use of language such as "in my opinion" or "I think" are considered "highly suggestive of opinion." *Id. See also Vail*, 72 Ohio St.3d at 282 (such as where a column was titled, "Commentary"). In ascertaining whether the words should be "characterized as statements of objective facts or subjective hyperbole," this context factor leans toward finding a mere opinion if "[t]he general tenor of the column is sarcastic, more typical of persuasive speech than factual reporting." *Vail*, 72 Ohio St.3d

at 282. The factor may be weighed in favor of a finding of protected opinion if the context demonstrates the writer "is not making an attempt to be impartial" and "no secret is made of his bias." *Scott*, 25 Ohio St.3d at 253 (noting a reader of the words in context would be "hard pressed" to accept the statements as impartial reporting).

**{¶38}** Fourth, applying the factor as to the broader context, the Court considers the location of the published words. *Scott*, 25 Ohio St.3d at 253-254 (emphasizing the article was on the sports page as opposed to the legal news). *See also Vail*, 72 Ohio St.3d at 282 (stressing the commentary piece appeared in the "forum" section as opposed to the news section). The social context and the writer's reputation for hyperbole and opinion can be considered. *Vail*, 72 Ohio St.3d at 282. In examining the "broader social context" and the influence that a certain "genre" of writing will have on the reader, the court can consider if the writing is part of a "social forum for personal opinion." *Wampler*, 93 Ohio St.3d at 131 (such as a letter to the editor).

**{¶39}** Again, Appellants raise five labels on appeal as supporting the defamation claim: liar, cheat, scammer, mentally ill, and stupid.

**{¶40}** We start with "liar" and "cheat" as they were both from Wilkinson's personal Facebook page and depicted on the same screenshot (and the same exhibit). (Ex. 112). More than two weeks after he quit, Wilkinson noted that he was waiting for the return of his pickup truck and said: "I've been promised it will be here by noon today. I really hope so…but coming from a liar I just don't know." After a friend commented, he replied: "I don't know either. One minute they're super cool the next minute they're trying to cheat you."

**{¶41}** The verb "cheat" is "loosely definable," and the expression of belief that someone is "trying to cheat" is "inherently imprecise and subject to myriad subjective interpretations." *See Wampler*, 3 Ohio St.3d at 128 (as was the description of the plaintiff as an "uncaring" and "ruthless speculator" who charged "exorbitant rent" due to "self-centered greed" and was ruining the community like a "mindless" corporation). The phrase "trying to cheat" may be even more "loosely defined" than the word "scammer" (discussed below in the analysis of Wilkinson's texts). *See McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir.1987) (the word "scam" does not have a precise definition, means different things to different people, and there is no single usage in common phraseology).

In *Vail*, the Court found the description of the plaintiff as an anti-homosexual, gay-bashing bigot "lacks precise meaning and would be understood by the ordinary reader for just what it is—one person's attempt to persuade public opinion. * * * Each term conjures a vast array of highly emotional responses that will vary from reader to reader." *Vail*, 72 Ohio St.3d at 283. The phrase "trying to cheat" was similarly Wilkinson's subjective "value-laden" expression of feeling which was susceptible to widely different interpretations.

{¶42} Calling someone a "liar" is more well-defined. In *Scott*, the first factor was weighed in the plaintiff's favor where the defendant wrote that the plaintiff lied at a hearing. *Scott*, 25 Ohio St.3d 243. Notably however, *Scott* involved a specific accusation that the plaintiff lied at a hearing after swearing to tell the truth, and the Court still found the statement was a protected opinion under the totality of the circumstances. In *Vail*, the Supreme Court concluded the accusation that a person was not "pro" honesty could be construed by a reader as an objective statement which communicates a fact, but the Court still found it "insufficient to overcome the conclusion that an ordinary reader would believe that statement, just as the others, to be the opinion of the writer." *Vail*, 72 Ohio St.3d at 283.

{¶43} We move to the second factor which looks at whether the statement is objectively verifiable. If the "statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content" but will understand the statement is "value-laden and represents a point of view that is obviously subjective." *Vail*, 72 Ohio St.3d at 283. We consider whether there exists a plausible method of verifying the statements calling a person a "liar" who "[o]ne minute [is] super cool [but,] the next minute [is] trying to cheat you." In *Vail*, the Court said references to the plaintiff's honesty were "possibly verifiable facts," but the disputed writing in that case suggested the reason behind the writer's belief. *Id.* (then concluding the words "in the context in which they were written" clearly represented a subjective point of view and did not support a defamation cause of action). In *Scott*, it was clear "the averred defamatory language [was] an articulation of an objectively verifiable event" because whether the plaintiff lied under oath was objectively verifiable by the transcript of the hearing discussed by the defendant in the writing. *Scott*, 25 Ohio St.3d at 252.

**{¶44}** As the factors are fluid, context can be used in assessing the verifiability of the statement. In the particular contested "liar" post, Wilkinson did not seem to actively connect the term "liar" to a fact. His mention of the truck seemed to be an expression of concern over whether he should believe the appointment to return the truck would proceed as scheduled. This particular post did not mention facts which could be verified or disproven. The post could be read with his next contested post which suggested Appellants were "trying to cheat" him. This could support a reading of his comments as referencing the fact that his truck was being used by the company instead of being returned to him. The continued use of his truck was objectively verifiable. (We note the continued use of his truck was proven to be true, and the propriety of this continued use was a subject of this lawsuit wherein the court found no agreement to transfer ownership of his truck to the company.)

**{¶45}** The combined posts and words surrounding the specific contested language also tie in to the third factor, the general context of the words. Although Wilkinson did not preface his comments with "in my opinion" or "I think," he did essentially express that he did not know what to think in both contested posts. *See Scott*, 25 Ohio St.3d at 252 (although not dispositive, the use of labeling language suggesting the statement is a personal judgment will "strongly militate in favor of the statement as opinion"). Opining that someone is "trying to cheat" can be seen as more of an unformulated position of opinion than saying someone "cheated" already. Wilkinson clearly was "not making an attempt to be impartial" and "no secret is made of his bias." *See id.* at 253. The context tends to show Wilkinson's comments were "subjective hyperbole" on his personal situation and closer to "persuasive speech" than to factual reporting. *See Vail*, 72 Ohio St.3d at 282. Additionally, he did not name CCLD or Wallace in his Facebook posts; although, Appellants point to a post by a different person noting, "it's your partner."

**{¶46}** The broader social context factor would include the consideration of the location of the posts on Wilkinson's personal Facebook page where he was expressing concern to his friends about the promised return of his truck. Wallace believes the broad context factor works in her favor due to his status as her former business partner, which makes him appear to be a factual reporter. Having no access to his personal mode of

transportation under the circumstances was an emotional subject, and a reader would understand it as such; the writing was contained on Wilkinson's own "social forum for personal opinion." *See Wampler*, 93 Ohio St.3d at 131.

**{¶47}** In weighing the circumstances, we reiterate that no one factor is dispositive, and we compare the precedent. In *Scott*, the Court upheld summary judgment and found the statement that a school official lied (at a hearing after being sworn to tell the truth) was a protected opinion, even though the factors on the specific language and verifiability weighed in the plaintiff's favor. *Scott*, 25 Ohio St.3d 243. In *Vail*, the Court upheld the dismissal of a complaint for failure to state a claim after finding the following statements about the plaintiff were protected speech: she "doesn't like gay people"; her "anti-homosexual diatribe" constituted "hate-mongering"; she "added gay-bashing to the repertoire of right-wing, neo-numbskull tactics"; she was a "bigot"; and "Honesty, it would appear, is one value on which [she] is not so 'pro.'" *Vail*, 72 Ohio St.3d 279 (the totality of the circumstances showed "the ordinary reader would accept this column as opinion and not as fact"). In *Wampler,* the Court upheld summary judgment after finding it was mere opinion to write that a building owner was greedy, self-centered, uncaring, ruthless, and mindless, among other things. *Wampler*, 93 Ohio St.3d 111.

**{¶48}** Upon weighing the factors as relevant to the totality of the circumstances elicited during the bench trial in this case, we conclude the two contested comments posted on Wilkinson's personal Facebook page in a conversation with friends (saying he was concerned about a promise from a "liar" and suggesting Wallace was "trying to cheat" him) are protected opinions.

**{¶49}** The other three descriptors contested on appeal (scammers, mentally ill, and stupid) were used by Wilkinson in private texts to his friend. Wilkinson said: "I hope everything works out for you today. Just be careful. [DD] and Diane are scammer's!!" (Ex. 57) (DD is the aforementioned plowing subcontractor). In another set of texts, Wilkinson said to his friend: "They must be mentally ill or something" and "It's their fault and they're too f****** stupid to realize it." (Asterisks original to the text.) (Ex. 66).

**{¶50}** As to the factor examining the specific language, the word "scammer" is similar to the "trying to cheat you" language addressed above. Scammer is an expression that is "loosely definable" or "inherently imprecise and subject to myriad subjective

interpretations." *See Wampler*, 3 Ohio St.3d at 128. It is the writer's subjective, "value-laden" statement of hyperbole and name-calling. *See Vail*, 72 Ohio St.3d at 283 (just as the description of the plaintiff as anti-homosexual and bigoted). "[T]he word 'scam' does not have a precise meaning. * * * 'it means different things to different people ... and there is not a single usage in common phraseology.' While some connotations of the word may encompass criminal behavior, others do not." *McCabe*, 814 F.2d at 842.

**{¶51}** The label of "stupid" is also extremely subjective and does not necessarily relate to intelligence or mean someone is intellectually inferior. It is often used hyperbolically to show feelings and magnify the differences in opinions during a heated argument. Likewise, the phrase "[t]hey must be mentally ill or something" is indefinite, imprecise, ambiguous, value-laden, subjective, and variously interpretable. *See Wampler*, 3 Ohio St.3d at 128-129. "A statement that someone is 'crazy' is an expression of opinion that generally does not subject one to liability." *Rizvi v. St. Elizabeth Hosp. Med. Ctr.*, 146 Ohio App.3d 103, 110, 765 N.E.2d 395 (7th Dist.2001) (summary judgment for a teaching physician who said a resident physician was crazy). As to both examples, this court has observed: "People frequently use adjectives such as 'stupid' or 'crazy' to express their feelings or opinions about an individual. No reasonable listener would interpret such expressions as factual assertions about the individual's mental capacity." *Paige v. Youngstown Bd. of Edn.*, 7th Dist. Mahoning No. 93CA212 (Dec. 23, 1994).

**{¶52}** On the second factor, the texts admitted into evidence and raised on appeal did not include objectively verifiable facts presented by Wilkinson as proof that Wallace (and her sub-contractor) were "scammers," "stupid," and "must be mentally ill or something." The lack of precision in the definition of scammer makes the general assertion someone is a scammer incapable of being proven true or false. *McCabe*, 814 F.2d at 842. We will not scour the record for support for each factor where an appellant's brief does not specify the evidence or the page in the record. Although only raised in the facts of the brief and not set forth in the arguments supporting this assignment of error, we note that after calling Wallace a scammer, Wilkinson's text opined that she "screwed" him and others (used in the sense of a synonym to scammed). But, getting "screwed" by Wallace is just as general and subjective as the statement calling her a scammer and does not appear to be objectively verifiable as a result.

**{¶53}** As to the text "[t]hey must be mentally ill or something," there are subsequent statements in the text about a failure to pay him, his dire personal financial situation, and his belief they want to "take me down." Yet, it does not appear the financial comments related to the mentally ill opinion. Wallace does not refer us to items presented by Wilkinson as factual and admitted in evidence which could be objectively verified or disproven. From the exhibits admitted by the trial court, the "reasonable reader would not believe that the statement has specific factual content" but would understand it is hyperbolic, "value-laden and represents a point of view that is obviously subjective." *See Vail*, 72 Ohio St.3d at 283.

**{¶54}** As for the general context of the admitted texts, we mentioned some of the surrounding commentary. Notably, the use of "must be" before "mentally ill" and the addition of "or something" after it shows this was not Wilkinson's attempt at a diagnosis or a disclosure of one. Moreover, Wilkinson's application of the comment "must be mentally ill or something" *to two people at once* is indicative that he was not reporting on a fact but was using hyperbole. There is no indication the statement was meant to be taken literally.

**{¶55}** Calling Wallace (and the subcontractor) "stupid" was also clearly Wilkinson's subjective opinion and did not appear to be related to intelligence. He was venting about his dire financial situation. The context of the statements demonstrates he was "not making an attempt to be impartial" and "no secret is made of his bias." *See Scott*, 25 Ohio St.3d at 253. As to his warning that Wallace and her sub-contractor were "scammers" and his next text in the same exhibit vaguely saying Wallace "screwed" him and others, the general internal context of the words conveyed the "tenor" of personal and generalized complaint and persuasion rather than factual reporting. *See Vail*, 72 Ohio St.3d at 282.

**{¶56}** The broader social context was Wilkinson speaking by personal text to one friend, someone he knew before they met Wallace. This is an especially private and limited "social forum for personal opinion." *Wampler*, 93 Ohio St.3d at 131. *See also Vail*, 72 Ohio St.3d at 282 (in addition to the social context, the writer's reputation for hyperbole and opinion can be considered).

{¶57} In considering the totality of the circumstances, it appears Wilkinson's use of the words "scammer," "stupid," and "must be mentally ill or something" in private text messages to a friend can be considered constitutionally protected opinions. *Accord Rizvi*, 146 Ohio App.3d at 110 (where we upheld summary judgment for a physician who said another physician was crazy after finding it was an expression of opinion); *Paige*, 7th Dist. No. 93CA212 (where this court held no reasonable listener would interpret the expressions "crazy" or "stupid" as factual assertions about the plaintiff's mental capacity); *McCabe*, 814 F.2d at 842 (placing the subheading "scam" before complaining about a timeshare was a protected opinion).

{¶58} As the trial court recognized, once the absolute privilege of opinion applies, the defamation inquiry is at an end. This assignment of error is overruled.

FRAUD

{¶59} Appellants' second assignment of error contends:

"THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE APPELLEE WAS GUILTY OF FRAUD WHEN HE HAD, AMONG OTHER ACTIONS, ADMITTED TO COMMITTING THEFT FROM THE APPELLANT, AND IN HIDING EQUIPMENT BELONGING TO THE APPELLANT AFTER WRONGFULLY TERMINATING HIS CONTRACTUAL RELATIONSHIP WITH APPELLANT."

{¶60} To recover for fraud, a plaintiff must prove: (1) a representation (or a concealment of a fact if there is duty to disclose), (2) which is material to the transaction, (3) made falsely, with knowledge of its falsity or with such utter disregard as to its truth that knowledge may be inferred, (4) with the intent to mislead another into relying on it, (5) justifiable reliance on the representation, and (6) injury proximately caused by the reliance. *Burr v. Board of Cty. Commrs. of Stark Cty.,* 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986), paragraph two of the syllabus. As to the first element, Appellants acknowledge they are alleging a representation (rather concealment with duty to disclose) as their sole statement of law is: "Fraud is legally defined as a knowingly false representation causing resulting injury." (Apt.Br. 9)

{¶61} The complaint alleged Wilkinson committed fraud by falsely representing he would contribute his pickup truck to the company, would only use the company debit card for company expenses, and would refrain from competing. On these allegations, the

judgment entry concluded: the court did not believe Wilkinson ever agreed to give his personal vehicle to CCLD; there was no indication Wilkinson made a representation as to the debit card usage; and at the time he signed the Operating Agreement, his promise on competition was not false and he did not know he would be leaving the company.

{¶62} On appeal, Appellants briefly contend Wilkinson knowingly made false representations by: promising to contribute his truck to the business but then keeping it; continuing to possess company equipment; promising to provide labor to the business (and then wrongfully dissociating); and using a gift card stolen from Wallace's mail. Appellants say the trial court's judgment ruling against them on their fraud claim was against the manifest weight of the evidence.

{¶63} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12 (applying *Thompkins* to civil cases), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Weight is not a question of mathematics, but depends on its effect in inducing belief." *Id.* In determining whether a verdict is against the manifest weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences and determines whether, in resolving conflicts in the evidence, the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Eastley*, 132 Ohio St.3d 328 at ¶ 20, citing *Thompkins*, 78 Ohio St.3d at 387.

{¶64} The power of the appellate court to reverse a judgment as being against the manifest weight of the evidence is to be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387. We make every reasonable presumption in favor of the judgment and any finding of facts; if the evidence is susceptible of more than one construction, we are bound to interpret it in favor of the fact-finder's ruling. *Eastley*, 132 Ohio St.3d 328 at ¶ 21, citing *Seasons Coal Co. Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3.

{¶65} First, we address the appellate argument that Wilkinson committed fraud by representing he would provide labor to the business but then wrongfully dissociating from

the company. The fraud claim in the complaint did not mention this topic. The trial court considered the evidence of wrongful dissociation when addressing Appellants' contract claim and had no indication Appellants believed the contractual promise constituted fraud.

**{¶66}** Unlike other claims set forth in the complaint, fraud is a special matter that must be pled in the complaint with specificity. Civ.R. 9(B) ("In all averments of fraud * * *, the circumstances constituting fraud * * * shall be stated with particularity."). Considering the multitude of claims presented without specific pleading requirements and the relation of the dissociation to the contract claim, there is no indication this issue was tried as part of the fraud claim by implied consent; this is not argued in any event. Accordingly, the matter of dissociation after promising to provide labor was not before the court in the context of the fraud claim.

**{¶67}** Wilkinson also points out he provided labor for months after signing the agreement and there was no proof any statement as to the dissociation clause was made falsely with knowledge of falsity and with intent to mislead. The trial court pointed this out in rejecting the fraud claim on the non-compete clause, which was set forth in the complaint under the fraud claim but which is not maintained on appeal. On that topic, the trial court found the defendant did not know he would be quitting when he signed the agreement. Such finding was not contrary to the weight of the evidence.

**{¶68}** A subsequent failure to maintain a promise made when the business was formed does not mean the promise was false when it was made. *See Burr*, 23 Ohio St.3d at 73 (fraud elements); *Link v. Leadworks Corp.*, 79 Ohio App.3d 735, 742, 607 N.E.2d 1140 (8th Dist.1992) (unless there was no intent on the part of the promisor to perform, the general rule prohibits a fraud claim based on a promise of future performance). *See also Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, ¶ 63 ("a misrepresentation must involve a matter of fact that relates to the past or present" rather than a future prediction). Appellants fail to cite testimony indicating a contractual promise on dissociation was known to be false when the Operating Agreement was signed. And, this issue was not before the court as related to fraud in any event.

**{¶69}** As to the argument in Appellants' brief on possession of company equipment, the fraud claim in the complaint specified an allegation that Wilkinson

Case No. 20 CA 0946

promised to transfer his pickup truck to CCLD. The Operating Agreement did not bind him to contribute his truck to the company. As to any verbal agreement, the court found Wilkinson's testimony more credible than Wallace's testimony and concluded he did not promise to transfer his truck to the CCLD. The trial judge was in the best position to weigh the evidence and judge each witness's credibility by observing gestures, voice inflections, and demeanor during the testimony at the bench trial. *See Seasons Coal*, 10 Ohio St.3d at 80.

**{¶70}** In addressing other "lies" they claim qualified as fraud, Appellants' brief contends Wilkinson hid equipment after he quit, alluding to the snow plow. The trial court addressed the plow in the conversion claim, finding Wilkinson converted the plow Wallace purchased for CCLD by failing to return it (after saying his yard was too wet to move it when a demand for return was made). *The fraud claim* in the complaint did not mention a plow or other equipment. Plus, Wallace did not testify that Wilkinson's representation on the condition of his yard was false (even if it was a poor excuse) or that it induced reliance (as it occurred after he quit).

**{¶71}** We turn to the statement in Appellants' assignment of error claiming the trial court erred in failing to find fraud based on an admitted theft and to the argument thereunder stating Wilkinson lied to Wallace about "his theft of a gift card out of the appellant's home mailbox which he used for his personal use * * *." (Apt.Br. 9).

**{¶72}** We begin by pointing out the fraud claim in the complaint alleged Wilkinson made false representations as to the company "debit card" by saying he would only charge company expenses (but then allegedly using it for expenses unrelated to the business). The complaint's introductory fact section alleged Wilkinson "converted" funds by "stealing" a "Visa card" from Wallace's mail. At trial, Wallace's testimony distinguished between this "gift card" (which Wilkinson obtained from her mail while she was in Florida) and a Farmer's Bank debit card attached to the company's bank account (which Wilkinson was authorized to use). And, Wilkinson testified the gift card was Wallace's personal gift card and unrelated to the company. (Tr. 160).

**{¶73}** The Farmer's Bank debit card was issued in the name of "George Wilkinson Concrete Creations" for his use after Wilkinson and Wallace went to the bank together to open a company bank account before she left for Florida. (Tr. 27-28, 47). Wallace

deposited $4,100 into the account and complained Wilkinson "drained" it through unauthorized expenditures. She mentioned withdrawals for insurance premiums for Wilkinson's truck, which was used to plow for customers, while claiming the truck should be transferred to CCLD. She also mentioned $2,300 in salt purchases, pointing to a large amount of salt she had stored in her building and opining the long distance between the plowing jobs and building did not justify buying salt near the job sites.

**{¶74}** Wallace also testified Wilkinson used the Farmer's Bank debit card to pay for Taco Bell and gasoline, which she "didn't feel [he] had the authority to do * * *." (Tr. 23-24). She conceded it would have been a reasonable business expense to charge diesel gas for his truck if he was visiting customers. She said he also purchased some unleaded gas and opined this was improper even if he was driving an unleaded gas vehicle to visit prospective customers (because the truck was the vehicle related to company business). (Tr. 68-69). We note there was testimony indicating Wilkinson occasionally transported an employee who lived fairly far from the business (due to issues with the employee's vehicle and driver's license). (Tr. 192-193). Wilkinson's wife testified she was not happy about the extra time Wilkinson had to spend transporting this employee to work, but Wallace testified she wanted this employee to work more than Wilkinson allowed.

**{¶75}** A reasonable fact-finder in weighing the evidence could find many of the charges were valid business expenses. Regardless, Wilkinson's mere use exceeding what Wallace expected would be a business expense is not itself fraud. Although Wilkinson could not recall if Wallace expressly said he was permitted to use his Farmer's Bank debit card for these expenses, he testified there was no company policy or instructions defining allowable debit card use. (Tr. 144, 170). Wallace did not testify as to a statement Wilkinson made on his use of the debit card. The trial court therefore found no testimony on the agreed use of the card. In fact, Appellants' brief does not specify arguments against the trial court's fraud ruling as applied to the use of this particular card. Still, the above review assists in distinguishing the cards and the issues.

**{¶76}** The specific argument in Appellants' brief complains of the "theft" and use of a "gift card" from Wallace's mail. Considering the complaint's labeling of the act of taking the card from her mail as *conversion* and the failure to specify the "gift card" under

the *fraud* claim where the company "debit card" was mentioned, specificity under Civ.R. 9(B) could be seen as lacking under the circumstance of this case. The trial court's findings did not specifically refer to the gift card. The court rejected the fraud claim as to "debit card usage" and generally denied any outstanding claims or motions not specified in the entry. If the trial court decided to address and reject the gift card under the fraud claim, the observation made by the trial court as to debit card usage would apply to the gift card as well: there was no evidence of a representation by Wilkinson as to card usage.

**{¶77}** At trial, Wilkinson admitted his use of the gift card but said he paid Wallace back. (Tr. 145, 160). Wallace's testimony not only failed to mention any representation by Wilkinson as to the gift card, but also failed to refer to any induced reliance. In setting forth one sentence on the law applicable to fraud, Appellants acknowledge a false representation was required, but they do not then point to a representation regarding the gift card. Notably, fraud has different elements than conversion, and Appellants do not challenge the conversion decision on appeal.[3]

**{¶78}** There is no indication the court clearly lost its way and created a manifest miscarriage of justice on the fraud claim. This assignment of error is overruled.

<u>INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS</u>

**{¶79}** Appellants' third assignment of error claims:

"THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE APPELLEE COMMITTED AN INTENTIONAL INTERFERENCE WITH APPELLANT'S BUSINESS RELATIONSHIP WHEN APPELLEE WENT TO WORK FOR A CUSTOMER OF THE APPELLANT AFTER DISASSOCIATING HIMSELF FROM APPELLANT'S COMPANY, AND IN VIOLATION OF A NON-COMPETITION AGREEMENT."

---

[3] An appellant's brief shall contain "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." App.R. 16(A)(7). An appellant cannot use a reply brief to assign a new error by the trial court or to raise a new reason to reverse the judgment. *Oxford Mining Co. LLC v. Ohio Gathering Co. LLC*, 7th Dist. Belmont No. 19 BE 0016, 2020-Ohio-1363, ¶ 73; *Shutway v. Chesapeake Expl. LLC,* 2019-Ohio-1233, 134 N.E.3d 721, ¶ 77 (7th Dist.). Accordingly, we cannot address an additional statement in the reply brief which suggests Wilkinson's use of receipts to pay expenses before depositing them into the company account constituted fraud. In any event, the fraud claim in the complaint did not specify this allegation as required by Civ.R. 9(B), and the reply does not cite testimony on a representation by Wilkinson.

<u>Case No. 20 CA 0946</u>

{¶80} We begin by outlining the breach of contract decision as Appellants suggest it supports the argument that the court should have found Wilkinson liable for intentional interference with business relations. The trial court found Wilkinson breached the contract by wrongfully dissociating from CCLD and by violating a non-compete clause, which prohibited contacting or providing services for CCLD's customers and disclosing the customer list and which lasted two years from dissociation. A few months after leaving CCLD, Wilkinson gained employment at Cornerstone, and a few months later, he gained employment at G&T. As to G&T, the court found no evidence this was a CCLD customer or the job otherwise violated the non-compete clause. As to Cornerstone, however, the court found Wilkinson's employment there was a breach of the non-compete clause as Cornerstone was a customer of CCLD.

{¶81} Then, in rejecting Appellants' claim for intentional interference with business relations, the court observed: "While it's true Wilkinson did go to work for a customer [Cornerstone], there was not enough evidence to show that he actively terminated or interfered with any business relationships of [CCLD]." The trial court also said it "could not find any credibility" to the assertion that Wilkinson intentionally interfered with Appellants' business relationship with BG or other customers. (BG was the other company who subcontracted snow plowing to CCLD.)

{¶82} Appellants say they lost all contracts due to Wilkinson dissociating from CCLD. They point out some of the lost contracts were with Cornerstone, the company Wilkinson went to work for in violation of the non-competition clause. They urge the evidence weighs in favor of a conclusion that Wilkinson induced the customers to stop using CCLD's services that winter.

{¶83} Wilkinson responds by pointing to the judge's finding of a lack of credible evidence on this claim. Wilkinson says there is no evidence he actively and in fact induced a third-party with intent to cause the termination of the relationship. Focusing on Cornerstone (as Appellants' argument fails to specifically mention BG), Wilkinson suggests his wrongful dissociation and subsequent employment with Cornerstone did not constitute intentional interference which caused the termination of relationships with CCLD merely because the acts violated the contract.

**{¶84}** "The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A&B-Abell Elevator Co. Inc. v. Columbus/Central Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14, 651 N.E.2d 1283 (1995) (applying free speech privileges). The specific cause of action alleged here, called tortious (or intentional) interference with business relations (or relationships), is an intentional tort. "Ohio does not recognize a negligent interference with contractual relationship claim." *Watson v. Neurology Consultants Inc.*, 7th Dist. Mahoning No. 91 C.A. 74 (June 25, 1992) ("there is no duty of ordinary care with respect to damages flowing from a third party contract").'

**{¶85}** The elements of tortious interference with business relations can be listed as: (1) a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing termination of the relationship; (4) lack of justification; and (5) resulting damages. *Christopher v. Automotive Fin. Corp.*, 7th Dist. Mahoning No. 06 MA 186, 2008-Ohio-2972, ¶ 39-40 (adding the justification element after listing the other elements), applying *Fred Siegel Co. L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 176, 707 N.E.2d 853 (1999) (a tortious interference with contract case listing the elements and setting forth the following factors for "determining whether an actor has acted improperly in intentionally interfering with a contract or prospective contract of another": nature and proximity of the acts, interests of parties and society, motive, relationship, and fair competition).

**{¶86}** The intent must be to interfere and thereby cause the resulting failed business relationship. *Fred Siegel*, 85 Ohio St.3d at 176 (requiring "intentional procurement of" the third-party's termination of the contract or relationship). "It is not enough that he intend to perform the act; he must intend to produce the harm." *Haller v. Borror Corp.*, 50 Ohio St.3d 10, 16, 552 N.E.2d 207 (1990). Moreover, tortious interference does not occur merely because a breach of contract was intentional and the breach interfered with other business relationships; independent inducement of a third-party is required. *Castle Hill Holdings LLC v. Al Hut Inc.*, 8th Dist. Cuyahoga No. 86442, 2006-Ohio-1353, ¶ 85, 88, 91 (an intentional breach of contract is not a tort).

**{¶87}** At trial, Wilkinson testified he went to work for Cornerstone a few months after his January 13, 2018 dissociation from CCLD. (Tr. 147). He said he never told an existing customer to terminate a relationship with CCLD or a prospective customer to refrain from hiring CCLD. (Tr. 174-175). He said CCLD previously performed some snow plowing as a subcontractor for Cornerstone. (Tr. 165). Wallace testified she anticipated additional subcontracts for plowing work with Cornerstone but said this did not occur because Wilkinson committed CCLD to various subcontracts through BG. (Tr. 15-16, 94). Wallace testified that CCLD lost all contracts within 2 weeks "[b]ecause George quit." (Tr. 46, 122). She elsewhere said she lost all contracts except three within 30 days and BG canceled all but two of the subcontracts by the end of January. (Tr. 35, 51, 109).

**{¶88}** Wallace also suggested BG also cancelled some contracts due to property damage during plowing. (Apt.Br. 6, citing Tr. 41). CCLD repaired plow damage to property (grass and landscaping pavers) at BG's request. Wallace believed the damage was caused by Wilkinson when he plowed at some unknown time before he quit, presenting hearsay that her other driver claimed he did not cause the damage. If Appellants are suggesting the business relations with some BG customers deteriorated in part as a result of property damage allegedly caused when Wilkinson was still plowing, a fact-finder could recognize that accidental damage can occur during snow plowing and can occur without the driver realizing damage was caused. There was no indication the damage was intentional. And, a fact-finder need not concur with Wallace's assumption that Wilkinson was the cause of the damage.

**{¶89}** As to the loss of all contracts which existed before Wilkinson quit, Wallace suggested Wilkinson's abrupt dissociation caused plowing issues and resulted in customers discontinuing to use CCLD's plowing services. A person's dissociation from a company in violation of a contract which incidentally results in foreseeable issues that cause clients to refrain from utilizing the company's service does not equate to a holding that the person who quit intentionally interfered with every business relationship that was lost. *See, e.g., Digital & Analog Design Corp. v. North Supply Co.,* 44 Ohio St.3d 36, 46, 540 N.E.2d 1358 (1989). Even when a breach of contract interfered with other business relations, the plaintiff "is limited to an action for breach of contract and may not recover in tort for business interference" unless "the breaching party indicates, by his breach, a

motive to interfere with the adverse party's business relations rather than an interference with business resulting as a mere consequence of such breach." *Id.*

**{¶90}** The trial court was not required to find Wilkinson's motive for quitting was to cause CCLD to lose customers but could reasonably conclude Wilkinson quit because he was exhausted, frustrated, behind in receiving his salary, and out of funds for necessary plowing expenses. We also note CCLD had a list of other drivers. The weight of the evidence did not require the court to presume the loss of the Cornerstone subcontracts was caused by intentional procurement of this harm by Wilkinson because he quit and went to work for them in violation of the non-compete clause. He went to work for Cornerstone later, after the loss of the initial subcontracts.

**{¶91}** As to other testimony that CCLD lost jobs to future customers in her neighborhood to Cornerstone, there was no indication Wilkinson knew these were customers of CCLD, which is a required element of the tort. *Fred Siegel*, 85 Ohio St.3d at 176; *Christopher*, 7th Dist. No. 06 MA 186 at ¶ 40. In fact, there is no indication they were customers or that Wallace had any relationship at all with them.

**{¶92}** On the credibility of Wilkinson's testimony about not telling customers to stop using CCLD's services, it must be remembered the trier of fact occupies the best position from which to judge witness credibility by observing gestures, voice inflections, and demeanor. *Seasons Coal*, 10 Ohio St.3d at 80. In addition, various allegations as to the tortious interference with a business relations claim are based on what Appellants believe are reasonable inferences, but which belief the trial court did not share. The trial court could reasonably discount the theories implied by Wallace's testimony. There was no indication Wilkinson caused a business relations failure by complaining about Wallace in texts to his friend. The trier of fact, who occupied the best position from which to weigh the evidence, was not required to find he intentionally and actually interfered with CCLD's relationships with its customers as a result of the comments on his personal Facebook page wherein he was concerned about the return of his truck; we also note the court found he was entitled to his truck. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley*, 132 Ohio St.3d 328 at ¶ 21, quoting *Seasons Coal*, 10 Ohio St.3d at 80, fn. 3.

{¶93} "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley*, 132 Ohio St.3d 328 at ¶ 21, quoting *Seasons Coal*, 10 Ohio St.3d at 80, fn. 3. The trial court did not clearly lose its way in weighing the evidence and assigning credibility on Appellants' allegations of intentional interference with business relations. Accordingly, the judgment for Wilkinson on this claim was not contrary to the manifest weight of the evidence, and this assignment of error is overruled.

BREACH OF CONTRACT DAMAGES

{¶94} Both sides contest the amount of the damages awarded for contractual breaches, with Appellants saying they were inadequate and Wilkinson saying they were speculative and excessive. On this topic, Appellants' fourth assignment of error alleges:

"THE TRIAL COURT ERRED IN FAILING TO AWARD ADEQUATE DAMAGES TO REPRESENT THE AMOUNT OF MONEY THE APPELLANT WAS FORCED TO LOSE AS A RESULT OF ALL OF APPELLEE'S ACTIONS."

{¶95} To the contrary, Wilkinson's second assignment of error in his cross-appeal alleges:

"THE TRIAL COURT ERRED IN AWARDING SPECULATIVE DAMAGES TO THE PLAINTIFF-APPELLANT WHERE THE COURT OPINED TWICE THAT IT DID NOT 'HAVE EVIDENCE OF AN EXACT AMOUNT OF COMPENSATORY DAMAGE.' "

{¶96} "Money damages awarded in a breach of contract action are designed to place the aggrieved party in the same position it would have been in had the contract not been violated." *State ex rel. Stacy v. Batavia Local School Dist. Bd. of Edn.*, 105 Ohio St.3d 476, 2005-Ohio-2974, 829 N.E.2d 298, ¶ 26. As Appellants recognize, this represents their expectation interest and allows the recovery of lost profits.

{¶97} "Lost profits may be recovered by the plaintiff in a breach of contract action if: (1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty." *City of Gahanna v. Eastgate Props. Inc.*, 36 Ohio St.3d 65, 68, 521 N.E.2d 814 (1988). Under

the third prong, "the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *Eastgate Props.*, 36 Ohio St.3d at 68.

**{¶98}** In proving lost profits, the plaintiff must show "(a) what he would have received from the performance so prevented" and "(b) what such performance would have cost him (or the value to him of relief therefrom)." *Digital & Analog Design Corp. v. North Supply Co.*, 44 Ohio St.3d 36, 40, 540 N.E.2d 1358 (1989). "Unless he proves both of those facts, he cannot recover as damages the profits he would have earned from full performance of the contract." *Id.* Still, in some cases, the plaintiff may show the performance would not have resulted in any expenses or he was not relieved from expenses. *Id.*

**{¶99}** In general, the reviewing court "will not disturb a decision of the trial court as to a determination of damages absent an abuse of discretion." *Roberts v. United States Fid. & Guar. Co.*, 75 Ohio St.3d 630, 634, 665 N.E.2d 664 (1996), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). The trial court abuses its discretion if the decision is unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219. The Supreme Court has cautioned, however, that speculative evidence, including evidence which does not meet the lost profit thresholds demonstrating lost receipts and costs saved, would be considered insufficient. *Digital & Analog*, 44 Ohio St.3d at 40.

**{¶100}** The parties discuss the damages for both breaches together. However, the trial court separated the discussion on the two breaches, both when ruling on liability for each breach and when awarding damages of $20,000 for the non-compete clause breach and $15,000 for the dissociation clause breach. Each breach occurred at different times, and the evidence as to damages for each breach was distinct.

<u>$15,000 for Breach of Dissociation Clause</u>

**{¶101}** The court found Wilkinson intentionally resigned without advance notice while the company was active and breached the dissociation clause in Section 13.04 of the Operating Agreement, which provided for liability for any damages resulting from wrongful dissociation. This holding is not challenged by Wilkinson on appeal; nor does he contest the initial premise that damages could be recovered for his quitting and the

loss of his labor (if evidence supported the loss and amount). In awarding $15,000 in damages for breach of the dissociation clause, the trial court said:

> The damages for this breach are not clear cut. Wallace testified at trial that she had to hire a sub-contractor for an approximate total of $43,000, to perform the work that Wilkinson would have performed if he had not disassociated. However, there was no reliable testimony given as to CCL[D]'s other expenses related to Wilkinson's disassociation. Furthermore, there was no testimony or evidence given to show CCL[D]'s income during the time that the third-party subcontractor performed Wilkinson's duties. While the Court does not have evidence of an exact amount of compensatory damages, the Court is convinced that Plaintiffs did suffer compensatory damages as a result of the breach.

(Elsewhere, the judgment used the contractual term "dissociate".)

{¶102} Appellants say they established lost profits with reasonable certainty as CCLD lost its customers in the two weeks after Wilkinson quit. They claim these customers would have provided them with profits of over $150,000. They point to the cost of DD's labor to replace the labor Wilkinson was to provide. They also suggest they were entitled to the cost of supplies (such as salt), equipment (such as a skid loader and the converted plow), and all the money Wallace spent financing the company.

{¶103} The latter argument appears to be an attempt at seeking reimbursement for outlays allegedly made in anticipation of the breaching party's performance under the contract (by not quitting). "[R]eliance damages reimburse the non-breaching party for expenditures made in performing the contract" and put the party in the position they were in before the contact was made. *Averback v. Montrose Ford Inc.*, 9th Dist. No. 28875, 2019-Ohio-373, 120 N.E.3d 125, ¶ 40. When the plaintiff is unable to prove expectation damages through lost profits, she can avoid enforcement of the contract and seek reliance damages. *Id.*, citing *Alternatives Unlimited-Special Inc. v. Ohio Dept. of Edn.*, 10th Dist. Franklin No. 12AP-647, 2013-Ohio-3890, ¶ 29 (explaining the fundamental difference in expectation damages, which affirm the existence of the contract and seek the benefit of the bargain, and reliance damages, which denies the contract).

{¶104} However, reliance damages are an alternative theory of recovery to lost profits; not an additional right. Furthermore, reliance on Wilkinson *never* quitting was not specified. Wallace allowed the third member to dissociate notwithstanding various outlays. As Wilkinson points out: Wallace's expenditures were made in forming and running the company, items were not sold at loss, and the company still exists. For instance, Wallace failed to convincingly indicate purchased items were not useful in the business in order to show the detriment. There was no indication the entire loss (on a profit and loss statement for the year) was attributable to Wilkinson quitting. In any case, Appellants' contractual recovery theory sought to *enforce* the contract and receive lost profits (due to lost customers) with consideration of the cost for effecting cover for a member's labor for a reasonable time. And, the brief cites no law on reliance principles; rather, it cites to the standard principles of expectation, benefit of the bargain, or lost profit in addressing the right to damages.

{¶105} As to the lost profits claim in Appellants' brief, stating Wallace testified to $150,000 in lost profits from the loss of the customers they were plowing for at the time Wilkinson quit, we first point out her actual testimony was: "That winter would have probably profited around a hundred to a hundred fifty thousand dollars." (Tr. 52). She said the figure was based on one month where they received $11,000. (Tr. 51). On questioning by the court, she later said she came up with the figure by taking the $30 per hour rate that CCLD charges at 40 hours per week, suggesting this should keep being tallied through the judgment. (Tr. 109). The trial court was not required to find her testimony realistic or her continuing time period reasonable under the circumstances, and the measure of damages is governed by law rather than a plaintiff's demand at trial.

{¶106} A plaintiff in a breach of contract action cannot just demand amounts because they seem fair to that party. For instance, Wallace asked for an additional $35,000 as punishment for quitting because she thought it was "fair" in addition to the other lost profits she tried to claim. (Tr. 127). As Wilkinson points out, there was no support for this demand. The contract did not provide for liquidated damages. Similarly, she cannot demand $100,000 because she thinks it is fair based on her estimate this would have been the *revenue* generated from customers lost as a result of Wilkinson's dissociation.

**{¶107}** Although Wallace used the word profit, the estimated figure was actually the revenue as it did not account for various expenses the company would have encountered in generating the estimated figure had the customers not been lost. We note a company does not necessarily make profit because it has a revenue stream, especially a brand new company learning whether there are sufficient funds allocated to pay expenses, whether the expenses can be trimmed in places, whether the company could be run while one of its two members spends the winter in Florida, and whether the laboring member can survive with reduced and then late (or even eliminated) salary payments.

**{¶108}** A plaintiff cannot simply demand what she would have received but must also show "what such performance would have cost him (or the value to him of relief therefrom)." *Digital & Analog*, 44 Ohio St.3d at 40. "Unless he proves both of those facts, he cannot recover as damages the profits he would have earned from full performance of the contract." *Id.* "Evidence which does not meet these thresholds must be considered speculative and an insufficient basis for an award of damages." *Id.*

**{¶109}** Contrary to Wilkinson's argument, however, Wallace's testimony provided some evidence of past direct expenses for the lost contracts, such as salt and fuel. It was just a sampling of charges and would be dependent on snowfall. Wallace also said she relied on a one-month statement in which Wilkinson's wife set forth amounts for revenue and expenses, showing a balance of over $5,000 for the month. Additionally, there was testimony on the cost of Wilkinson's labor and the cost of replacement labor.

**{¶110}** Wallace essentially asked the court to assume all lost customers were a result of Wilkinson's dissociation. She said they had back-up plowers, and she paid one of them (DD) $44,000. The court was convinced she suffered damages from his dissociation and thus found at least some of the lost customers were caused by Wilkinson's January 13, 2018 breach of contact. Nevertheless, her testimony also indicated they obtained replacement customers (considering these payments for labor and her statement that DD was able to "make up" some of the loss). (Tr. 127). The trial court pointed out the issue with Wallace failing to disclose the income from these customers. Notably, the testimony indicated the company could not have handled any additional customers before Wilkinson quit.

**{¶111}** The trial court could reasonably find, with the exception of any reasonable amounts paid to DD to provide services as Wilkinson's substitute for a reasonable time, "there was no reliable testimony" on expenses or on income after Wilkinson left. Wilkinson's cross-appeal points to this observation and to the trial court's statements that damages for the dissociation claim were "not clear cut" and the record lacked evidence "of an exact amount of compensatory damages." Wilkinson concludes this shows the $15,000 damage award was based on speculation. However, these observations by the trial court referred to Wallace's total amount requested (lost revenue plus other amounts she opined were fair); the court was explaining why it did not adopt the amounts scattered about Wallace's testimony. Although the damages must be shown with reasonable certainty, exact mathematical precision is not required.

**{¶112}** Although the trial court noted the lack of evidence on projected profit (based on past profit) versus actual profit after the breach, it is reasonable to recognize that Wallace essentially testified they did not make more money after Wilkinson quit. Even rejecting Wallace's suggestion of decreased customers and assuming the revenue and expenses stayed the same, there was an additional cost flowing from Wilkinson's breach. The cost of cover in some circumstances is considered incidental damage which is added to the revenue in the lost profits formula before subtracting costs; or, it can be seen as an expense in generating the replacement profit. *See generally Top Notch Excavating L.L.C. v. Peterman*, 6th Dist. Erie No. E-11-073, 2012-Ohio-5266, ¶ 12. Either way, the court could consider this reduction in receipts or additional loss due to this expense.

**{¶113}** Appellants' brief emphasizes the $44,000 paid to DD to cover Wilkinson's labor after he wrongfully dissociated. (Tr. 125). The trial court awarded $15,000 for compensatory damages for the wrongful dissociation breach. Appellants suggest they were entitled to the full amount of the cost to replace the labor Wilkinson was to "donate." However, multiple reasonable considerations would support the trial court exercising its discretion as trier of fact in rejecting this assertion.

**{¶114}** Wallace testified DD provided some of the services prior to Wilkinson's dissociation. (Tr. 19-20). Moreover, Wallace suggested she was stuck with DD and his rates due to an agreement DD said he entered with CCLD. (Tr. 20, 75). She also

indicated a belief DD's services were not worth this much, but she had no choice. (Tr. 75, 77). Yet: she complained Wilkinson did not use two other people instead of DD; she never obtained evidence of an agreement; and she presented only alleged hearsay from DD as to the agreement. The trial court could also consider recovery for the replacement was only warranted for a reasonable time period after dissociation under the totality of the circumstances.

{¶115} Furthermore, Appellants' use of the word "donate" ignores the evidence of what Wilkinson's performance would have cost Appellants. In another part of the judgment entry, the trial court recognized Wallace's agreement to pay Wilkinson $1,000 per week for labor which was reduced to $750 per week in December 2017. At trial, Wallace specifically testified that although the written contract did not mention a salary for Wilkinson, she "felt he needed something" for his labor. She identified $1,000 per week in payments she made to him for his labor and said this was later reduced to $750 per week "[b]ecause we had discussed after uh…the contract that I could take it down to seven-fifty, he was fine with that but that" and identified an example of "12-17, another two weeks of pay. Fifteen hundred." (Tr. 51). She later reiterated, "at first it was a thousand dollars a week, that [the member whom she allowed to dissociate], George [Wilkinson] and I, all decided on for the company. Then um...I asked him if it was alright, and this was after [the other member] left, if it was alright, if I could cut it down to seven-fifty a week. [Wilkinson] said, yes, it was." (Tr. 102). This testimony indicated the salary was pursuant to an agreement as she twice said she asked his permission to lower the amount. In any case, she was paying Wilkinson for his labor.

{¶116} Contrary to Wilkinson's contention, the award for the dissociation breach of contract allegation was not based on legally insufficient evidence of damages or on mere speculation, and there is no indication the court abused its discretion in weighing the evidence as $15,000 was not an excessive amount under the totality of the circumstances. Contrary to Appellants' opposing position, the award was not inadequate as the trial court could weigh the evidence and find $15,000 was the most it could award with reasonable certainty.

<u>$20,000 for Breach of Non-Compete Clause</u>

**{¶117}** The court found Wilkinson breached the non-compete clause in Section 19.07 of the Operating Agreement, wherein it was promised that for two years after dissociation, a member "will not contact or provide services for Company's customers during this non-compete period through any form of communication nor disclose Company's customer list to any person or entity." Wilkinson acknowledged he was the one who requested the clause in the contract. The court found the clause was reasonable, noting it was limited and only applied to existing customers. The court said Cornerstone was a customer and Wilkinson breached this clause by going to work for Cornerstone within the two-year period. (The court found no breach from his subsequent employment with G&T as there was no testimony this work involved customers of CCLD.)

**{¶118}** In discussing the rationale on the amount of damages awarded for breach of the non-compete clause, the court stated:

> The damages presented at trial concerning this breach were purely speculative. Plaintiff contends she lost two contracts to Cornerstone Landscaping, however there was no proof given to show this. While the court does not have evidence of an exact amount of compensatory damages, the court is convinced that Plaintiffs did suffer compensatory damages as a result of the breach.

From this, the court awarded $20,000 as compensatory damages for this breach.

**{¶119}** Appellants generally say they proved lost profits with reasonable certainty and point out that an expert was not required. In claiming the $20,000 damage award for breach of the non-compete clause was inadequate to account for lost profits, Appellants' brief says Wallace testified the company lost two jobs to Cornerstone which exceeded $100,000. In support, they cite a range of ten pages of the transcript during Wallace's cross-examination, but there was no testimony on Cornerstone in that section.

**{¶120}** Wilkinson's cross-appeal argues the figures presented by Wallace at trial on lost profits were unexplained, conclusory, and not proven to the requisite degree of reasonable certainty. He says only the right to nominal damages was established, pointing out the trial court called the evidence on damages for breach of the non-compete

clause "purely speculative." He concludes the court should not have just estimated $20,000 in damages for this claim.

**{¶121}** Wallace testified that after Wilkinson started working at Cornerstone, this company advertised its services in a publication specific to the Lake Mohawk community where she and Wilkinson lived; she said in the six years she lived at the lake, Cornerstone had never before advertised there. (Tr. 30). Wallace thereafter saw Cornerstone performing work for customers at the lake by building retaining walls in the $10,000 to $60,000 range and "possibly outside patios with kitchens. Um…high dollar stuff." She claimed, "There was one that I would have probably bid about a hundred and twenty thousand for." (Tr. 31).

**{¶122}** "It has been consistently held in Ohio that in a breach of a covenant not to compete, the usual measure of damages is lost profits." *Briggs v. GLA Water Mgt.*, 6th Dist. Wood No. WD-12-062, 2014-Ohio-1551, ¶ 30. *See also Yardmaster Inc. v. Orris*, 11th Dist. Lake No. 9-305 (June 29, 1984). And, the measure of damages Appellants sought on this contract claim was lost profits. As noted, lost profits for breach of contract require a showing that profits were within the parties' contemplation when the contract was made, the loss of profits was the probable result of the breach, and the lost profits were not remote or speculative but shown with reasonable certainty. *Eastgate Props.*, 36 Ohio St.3d at 68.

**{¶123}** The trial court rejected the contention CCLD "lost two contracts to Cornerstone." The trial court was entitled to find Wallace's testimony lacked credibility. The trial court judge was in the best position to weigh the evidence and judge Wallace's credibility as she testified at the bench trial. *See Seasons Coal*, 10 Ohio St.3d at 80 (first-hand observation of gestures, voice inflections, and demeanor). The court may have found Wallace's claim was unrealistic as to "high dollar" jobs, considering CCLD was a new business and there was no evidence its members or employees had prior experience in major projects including those involving "possibly outside patios with kitchens."

**{¶124}** Still, the court said it was "convinced" Wilkinson's employment at Cornerstone caused some damages. At the same time, the trial court described the evidence on the damages for breach of the non-compete clause as "purely speculative." As Wilkinson observes, it is not just the existence of lost profits that must be established

with reasonable certainty: "the *amount* of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." (Emphasis added.) *Eastgate Props.*, 36 Ohio St.3d at 68 (therefore, the amount of lost profits cannot be speculative).

{¶125} Even as to more realistic retaining wall jobs, Wallace did not testify to the number of retaining wall projects she believed CCLD lost due to Cornerstone's competition. She believed she lost jobs to Cornerstone, generally saying she saw work being performed at Lake Mohawk without providing specific locations for these projects. Such generality would preclude the defense from providing rebuttal evidence (for instance, to show these were Cornerstone's prior customers). She presumed she could have obtained the jobs at the lake just because she lived at the lake. Furthermore, Wallace gave a large range of estimates on what she would have bid. Her testimony sounded unstudied. And, as Wilkinson points out, lost profits must be based on net profit; reasonably anticipated costs of performing must be deducted from anticipated revenue. Wallace did not mention expenses for the projects she saw Cornerstone completing. As explained supra, the amount a contractor would have bid on a job or would have received as payment from the customer does not equate to lost profits, i.e., gross revenue is not profit.

{¶126} If the evidence on the amount of lost profit damages is considered speculative by the trial court, the trial court should not just come up with an estimated amount lower than a plaintiff seeks because it is convinced lost profits were incurred even though the plaintiff did not sufficiently establish various aspects relevant to the amount of loss profits. *See Digital & Analog*, 44 Ohio St.3d at 40; *Eastgate Props.*, 36 Ohio St.3d at 68. Without this data, economic loss for breach of this clause could not be calculated with reasonable certainty. The Supreme Court has cautioned that a plaintiff seeking lost profits must show two items: (1) she must show what she would have received if she did not lose the job *and* (2) *she must show what the job would have cost her. Digital & Analog*, 44 Ohio St.3d at 40. "Unless [the plaintiff] proves both of those facts, [s]he cannot recover as damages the profits [s]he would have earned from full performance of the contract." *Id.* "Evidence which does not meet these thresholds must be considered speculative and an insufficient basis for an award of damages." *Id.* As can be seen, the failure to satisfy

these elements is an issue of sufficiency.[4]  We cannot avoid the lack of data and uphold the trial court's judgment.

**{¶127}**  Although the weighing of the evidence was questionable, we need not reach the topic of weight because the trial court specifically said the damages presented at trial on this breach were purely speculative and the evidence was insufficient as the anticipated revenue was not itemized or certain and the cost to perform was not provided. Since the trial court entered a damage award based on insufficient evidence of the elements of lost profits, Wilkinson correctly argues the trial court's decision to award $20,000 for breach of non-compete clause was based on speculation (and therefore an unreasonable and arbitrary abuse of discretion).

**{¶128}**  Where a breach of contract was proven at trial, but the evidence fails to sufficiently establish actual damages *or fails to sufficiently establish the extent of the plaintiff's loss*, the court may award nominal damages.  *DeCastro v. Wellston Cty. Sch. Dist. Bd. of Edn.*, 94 Ohio St.3d 197, 199, 761 N.E.2d 612 (2002).  Likewise, where the plaintiff alleges lost profits as a result of a non-compete clause violation but the amount of profits lost was not demonstrated due to the lack of proof on the elements set forth by the Ohio Supreme Court, then a small sum can be awarded as nominal damages.  *See id.* at 199, quoting 3 Restatement of the Law 2d, Contracts, Section 346 (1981).  Of course, $20,000 is not nominal damages.[5]

**{¶129}**  In sum, Appellants' fourth assignment of error on inadequate damages is overruled, while Wilkinson's second assignment of error in his cross-appeal has merit in part.  The $20,000 damage award for breach of the non-compete clause requires reversal, but we will remand for the trial court to issue a nominal damage award.

CONVERSION

**{¶130}**  Wilkinson's first assignment of error set forth in his cross-appeal alleges:

---

[4] A sufficiency challenge is a question of law reviewed de novo.  *Eastley*, 132 Ohio St.3d 328 at ¶ 11, quoting *Thompkins*, 78 Ohio St.3d at 386.  As in criminal cases, civil cases also utilize the distinct concepts of sufficiency of the evidence and weight of the evidence.  *Id.* at ¶ 23.

[5] Nominal damages are often $10 or $100, with amounts as high as $300 being upheld in past Ohio cases. *See Cambridge Co. v. Telsat Inc.*, 9th Dist. Summit No. 23935, 2008-Ohio-1056, ¶ 10 (approving $300 in nominal damages); *Bunte v. Talbott*, 10th Dist. Franklin No. 76AP-300 (Sep. 14, 1976) (reducing a $500 award to $300 in nominal damages).  *See also* N.J. Rev.Stat. § 2A:15-5.10 (statutorily defining nominal damages as those "that are not designed to compensate a plaintiff and are less than $500").

"THE TRIAL COURT ERRED IN FINDING THAT DEFENDANT HAD CONVERTED A SNOW PLOW BELONGING TO THE PLAINTIFFS-APPELLANTS."

{¶131} "[C]onversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *State ex rel. Toma v. Corrigan*, 92 Ohio St.3d 589, 592, 752 N.E.2d 281 (2001), quoting *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990). The parties agree that if a defendant came into possession of the property lawfully and thus the allegation is unlawful retention, the defendant must have refused to deliver the property upon the rightful owner's demand for the return of the property. *Washington v. JP Morgan Chase Bank N.A.*, 7th Dist. Mahoning No. 17 MA 0115, 2018-Ohio-986, ¶ 21.

{¶132} The demand and refusal elements change an otherwise lawful possession into an unlawful conversion. *Id.* Where the defendant's initial possession was permissible, demand and refusal establish the act of exclusion by the dominion exercised or the act of withholding possession inconsistent with the owner's claim.

{¶133} The trial court found all items of property rightfully owned by CCLD or Wallace were returned by Wilkinson except a snow plow he still possessed at the time of trial. The court concluded Wilkinson's failure to return the plow constituted conversion.

{¶134} Wilkinson states the trial court's decision was against the manifest weight of the evidence. He says it was undisputed the plow came into his possession lawfully and claims there was no evidence he refused to return the snow plow. He recognizes there was testimony on a demand: the sheriff went to Wilkinson's house and retrieved some items, but Wilkinson said it was too wet to move the plow from his back yard. (Tr. 25). Wilkinson claims this was not a refusal and a subsequent demand was required. He believes two non-binding cases support his argument.

{¶135} In one case, a chattel owner sued a metal recycler in conversion after the owner's employees stole metal and sold it to the recycler. The trial court granted summary judgment where the metal lawfully came into the recycler's possession, the owner admitted no demand was made on the recycler, and no refusal therefore occurred. On appeal, the owner claimed a demand would have been futile. The Third District concluded there was no conversion without a demand and refusal. *Semco Inc. v. Sims*

*Bros.*, 3d Dist. Marion No. 9-12-62, 2013-Ohio-4109, ¶ 36. The case is not analogous as it was based on a lack of demand, but there was a demand in the case at bar.

**{¶136}** Wilkinson also says his case is analogous to a Tenth District case where the plaintiff demanded the landlord return a tenant's phone system (and showed him a copy of a judgment ordering the tenant to return the system). The appellate court held the landlord had no dominion over the items in the leased space and was not withholding possession of the plaintiff's items *before* the landlord evicted the tenant. *Ohio Telephone Equip. & Sales Inc. v. Hadler Realty Co.*, 24 Ohio App.3d 91, 93, 493 N.E.2d 289 (10th Dist.1985). Demands to a person at a time when he had no dominion or possession were ineffective, and thus, a new demand was required after he later gained dominion or possession. *Id.* at 94. Dissimilarly, Wilkinson did not lack dominion or possession at the time of the demand when the item was in his own backyard.

**{¶137}** Contrary to a suggestion in Wilkinson's brief, the issue in *Ohio Telephone* was not about disputed ownership of items but was about the fact the landlord had no right to enter a tenant's leased space at the time of the plaintiff's demands. Wilkinson does not contest the court's finding on Appellants' ownership of the plow but suggests a prior dispute on ownership was the motive behind his earlier failure to return it. Yet, there was no evidence showing he was contesting ownership at the time of the demand; such a defense was not raised at trial. In addition, conversion requires intent to exercise dominion over or withhold possession of the property but does not require intent to interfere with known rights; a defendant can be liable for conversion even if acting under a misapprehension of rights. *Gevedon v. Decker*, 2d Dist. Clark No. 2020-CA-21, 2021-Ohio-77, ¶ 30; *Manshadi v. Bleggi*, 2019-Ohio-1228, 134 N.E.3d 695, ¶ 37 (7th Dist.) (lack of motive or claim of mistake will not defeat a claim of conversion); *DeLorean Cadillac Inc. v. Weaver*, 8th Dist. Cuyahoga No. 71827 (Oct. 2, 1997).

**{¶138}** Next, it is recognized the appellate court in *Ohio Telephone* made a statement about the lack of a duty to affirmatively act to deliver the property. Yet, this direct holding was made when discussing the arguments about the landlord's duty *before the eviction*, when the court found the landlord had no duty to evict the tenant earlier just because a chattel owner wanted items from inside the leased space. *Ohio Telephone*, 24 Ohio App.3d at 93. After observing a new demand was required after the eviction and

Case No. 20 CA 0946

no demand occurred, the Tenth District did observe: "Even with a new demand, defendant was, at the most, only required to provide plaintiff with the opportunity to enter the office and remove the equipment itself." *Id.* at 94.

**{¶139}** However, this was dicta as the court already found no effective demand occurred. The statement was also made contemporaneously with the court's observation that the plaintiff installed the phone system in its customer office. The defendant-landlord in that case had no relation to the equipment's arrival at his realty, unlike the snow plow in Wilkinson's own yard. We also note after the landlord in *Ohio Telephone* gained possession of the leased space through eviction and even though no demand was then made, the landlord made it known to the plaintiff the phones were available, but the plaintiff did not respond. *Id.* at 92 (then, six months after retaking control of the leased space, he placed the phones in storage). Lastly, the Tenth District case is non-binding.

**{¶140}** CCLD and Wallace emphasize Wilkinson's own argument saying there must be evidence the plaintiff made a demand and "the defendant refused to deliver the property to the plaintiff" (quoting from Wilkinson's brief). They say Wilkinson has therefore admitted it is not the owner's duty to enter the defendant's real estate to retrieve the demanded chattel but is the defendant's duty to deliver the property to the owner. And, they sent a person to his property to demand the plow only to be turned away by an assertion of wet grass.

**{¶141}** Wilkinson's reply brief claims Appellants' response brief failed to address his argument that he was not refusing when the Sheriff came but was merely voicing an "impossibility." However, Wilkinson's initial brief did not specify an impossibility theory or cite the law stating a subsequent demand is required where a claimed condition makes return impracticable at the very moment of the demand.

**{¶142}** A defendant's claim on a wet yard is not the same as a landlord's claim he is not legally permitted to enter a tenant's leased space and remove items until after a lawful eviction. Unlike in *Ohio Telephone,* where the demand was ineffective due to the lack of dominion or possession at the time of demand, Wilkinson had dominion or possession at the time of the demand. The demand was therefore effective. In other words, a plaintiff's demand is not ineffective or premature because the defendant finds a reason why return should be delayed. Accordingly, no subsequent demand was required.

{¶143} As to proof on Wilkinson's refusal to return the property, the testimony showed he did not return it when the sheriff came to request its return during plow season *and* never returned it thereafter. A statement on a wet yard did not per se mean the return was impossible. Moreover, even where a qualified privilege allowing a delayed return is alleged, the need for delay must be asserted in good faith and under circumstances where it was reasonable to refuse at the moment because the item was inaccessible; plus, the defendant becomes liable after he has had a reasonable opportunity to obtain the chattel for delivery. Restatement of the Law 2d, Torts, Section 238, Comments a-c, and Section 241 (1965). Wilkinson's good faith at the moment of initial refusal based on a wet yard need not be presumed, and it was rational to conclude his "reasonable opportunity" to access the plow had passed. At the trial more than two years after the events, Wilkinson testified he still had the plow. (Tr. 143).

{¶144} Finally, circumstantial evidence can be considered by the fact-finder in addition to the direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001) (circumstantial evidence has the same probative value as direct evidence). The trier of fact can make reasonable inferences one way or the other as it weighs the evidence, and there is no indication the trial court clearly lost its way in this case. *See generally Eastley*, 132 Ohio St.3d 328 at ¶ 20. Under all of the circumstances existing in this case, the trial court's decision on the conversion claim as to the snow plow was not against the manifest weight of the evidence. This assignment of error is overruled.

CONVERSION DAMAGES

{¶145} Wilkinson's final assignment of error presented in his cross-appeal contends:

"THE TRIAL COURT ERRED BY AWARDING THE REPLACEMENT VALUE OF AN ITEM RATHER THAN THE VALUE OF THE ITEM THAT WAS JUDGED TO BE CONVERTED."

{¶146} The trial court awarded $13,948.50 in damages for conversion of the snow plow after stating, "This represents the only evidence offered in trial concerning the value of a like snow plow." Wilkinson points out this was the value of the new plow Wallace purchased to replace the one he retained. He points out the legal test for conversion damages is based on the value of the retained plow at the time of conversion and does

not call for the value of replacement with a new plow. In support, he says Wallace's testimony did not indicate the converted plow was new. He alternatively says that even if it was newly purchased after the business formed in October 2017, it was used for plowing that winter and would have depreciated by mid-January 2018.

**{¶147}** Appellants' response brief notes: the court applied the test for "the value of a like snow plow"; this happened to correspond to the value of the new, replacement plow under the circumstances of this case; and Wilkinson did not respond with evidence showing depreciation would have decreased the value of a new plow in the short period of use. The response also cites law stating: if market value cannot be obtained, the court can apply a flexible standard which considers factors including replacement cost, original cost, salvage value, and value to the owner. *Westfield Ins. Group v. Silco Fire & Sec.*, 5th Dist. Stark No. 2018CA00122, 2019-Ohio-2779, ¶ 64.

**{¶148}** "[T]he general rule for the measure of damages is the value of the property at the time of the conversion." *Erie R. Co. v. Steinberg*, 94 Ohio St. 189, 113 N.E. 814 (1916), syllabus. *See also R.G. Eng. & Mfg. v. Rance*, 7th Dist. Columbiana No. 01-CO-12, 2002-Ohio-5218, ¶ 89 (the measure of damages in a conversion action is the value of the converted property at the time it was converted). "The rule that the market value is the measure of damages for the wrongful conversion of personal property is subordinate to the fundamental rule that the owner must be fully compensated." *Bishop v. East Ohio Gas Co.*, 143 Ohio St. 541, 546, 56 N.E.2d 164, 166 (1944). The owner of the chattel can provide an opinion on the value, and an expert is not required. *Id.*

**{¶149}** The cited exception to the general rule is a "more elastic standard" called the "value to the owner" standard, and it applies "in exceptional circumstances" if the "market value cannot be feasibly obtained." *Bishop*, 143 Ohio St. at 546. *See also Erie R. Co.*, 94 Ohio St. 189 at syllabus ("where the property converted by the defendant to its use consists of articles for personal use, which have been used by the owner, and therefore have little or no market value, the measure of damages is the reasonable value to the owner at the time of conversion").

**{¶150}** Wilkinson points to one page in the transcript and says Wallace identified an invoice for a snow plow showing she paid $13,948.50 for a replacement plow. (Tr. 40). However, there was additional relevant testimony. The company was formed on

October 11, 2017. The testimony from Wallace indicated she subsequently paid to "put a new plow outfit on [Wilkinson's] truck, that was supposed to be uh…turned over to the company." (Tr. 23, 26). She testified she paid $12,000 for the plow (and approximately $12,000 for the salt box). (Tr. 23). She said the plow was at Wilkinson's house and was not returned after the sheriff went there to demand it. (Tr. 25). Wilkinson acknowledged the plow was still in his possession at the time of trial. (Tr. 143). Wallace even presented a photograph of Wilkinson's truck and testified that it showed the "brand new plow and salt box on it." (Tr. 49-50). Accordingly, there was evidence showing the plow he converted was new and had just been purchased.

{¶151} Contrary to Wilkinson's alternative suggestion, a court need not refuse to award damages where a plaintiff does not mention depreciation on a plow that was purchased mere weeks before its conversion. Wilkinson could have presented testimony asserting depreciation of the new plow if he believed its value decreased because it was used intermittently for approximately two months. "In the absence of evidence indicating depreciation of the property, we cannot conclude that the trial court was precluded from making a reasonable inference that the value of the property, at the time of conversion, remained unchanged." *See, e.g., Richmond v. Gerard*, 10th Dist. Franklin No. 95APE06-738 (Mar. 19, 1996) (the trial court can adopt the plaintiff's value without speculating on depreciation), quoting *Sullivan v. Morgan*, 10th Dist. Franklin No. 93AP-747 (Mar. 24, 1994) (rejecting a conversion defendant's argument that the court cannot award the plaintiff the price she paid for the item six years earlier).

{¶152} The trial court had evidence of the value of the actual converted item when it was purchased several weeks before the time of conversion. A fact-finder's decision adopting this value for conversion damages would not have been unreasonable just because a plaintiff did not mention depreciation at trial.

{¶153} However, the court failed to notice Wallace's specific testimony declaring she paid $12,000 for the plow the court found Wilkinson converted. She paid more for the replacement plow than for the one converted even though only weeks had passed. Contrary to the position in the response brief seeking to uphold the trial court's damage award, there were no circumstances justifying the use of a value which was *more* than the value paid for the item; and, this was not the trial court's stated position. The trial

court mistakenly believed there was no evidence besides the price Wilkinson paid for the replacement plow, failing to notice she specifically admitted the value of the converted plow was almost $2,000 less than the replacement plow.

**{¶154}** Wilkinson's conversion damages argument has merit in part; only in part because there was testimony indicating the converted plow was new and because the lack of evidence on depreciation did not preclude the court from using the value of the plow when it was purchased. Using the trial court's own reasoning, the damage award for conversion is decreased from $13,948.50 to $12,000, as this was the evidence presented by Wallace on the value of this plow several weeks before the conversion when it was purchased new.

CONCLUSION

**{¶155}** For the foregoing reasons, the trial court's decisions on liability are affirmed, and the $15,000 damage award for breach of contract by wrongful dissociation is affirmed. But, the $20,000 damage award for breach of the non-compete clause is reversed, and the case is remanded for the issuance of a nominal damage award. The damage award for conversion is reversed and reduced to $12,000.


Donofrio, P.J., concurs.

D'Apolito, J., concurs.

[Cite as *Concrete Creations & Landscape Design L.L.C. v. Wilkinson*, 2021-Ohio-2508.]

--------

For the reasons stated in the Opinion rendered herein, the final judgment and order of this Court is that the judgment of the Court of Common Pleas of Carroll County, Ohio, is affirmed in part and reversed in part.  We hereby remand this matter to the trial court for the issuance of a nominal damage award for breach of non-compete clause.  The damage award for conversion is reversed and reduced to $12,000 according to law and consistent with this Court's Opinion.  Costs to be taxed against the Appellee.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**